FILED IN DISTRICT COURT
OKLAHOMA COUNTY
AUG 31 2026
RICK WARREN
COURT CLERK
125

*1066350470*

**IN THE DISTRICT COURT OF OKLAHOMA COUNTY**
**STATE OF OKLAHOMA**

| | |
|---|---|
| ANTHONY TRUPIA, an individual,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF OKLAHOMA CITY, a municipal corporation; OKLAHOMA CITY WATER UTILITIES TRUST (OCWUT), a public trust; CHRIS BROWNING, individually and in his official capacity as Utilities Director and General Manager of OCWUT; JAMES D. COUCH, individually and in his official capacity as Chairman of OCWUT and Independent Trustee; DAVID HOLT, individually and in his official capacity as Mayor of Oklahoma City and OCWUT Trustee; MARK STONECIPHER, individually and in his official capacity as Councilmember and OCWUT Vice Chairman/Surrogate Trustee; CRAIG FREEMAN, individually and in his official capacity as City Manager and OCWUT Trustee; DON E. NOBLE, individually and as Owner of CIMARRON CONSTRUCTION CO., LLC; GARY MATTHEWS, individually and as Owner of MATTHEWS TRENCHING CO., INC.; RICK THOMPSON, individually and as Owner of WYNN CONSTRUCTION CO., INC.; CAROLLO ENGINEERS, INC.; BLACK & VEATCH CORPORATION; CROSSLAND HEAVY CONTRACTORS, INC.; ARCHER WESTERN CONSTRUCTION, LLC; WYNN CONSTRUCTION CO., INC.; CIMARRON CONSTRUCTION CO., LLC; MATTHEWS TRENCHING CO., INC.; KRAPFF-REYNOLDS CONSTRUCTION COMPANY; and JOHN DOE OKLAHOMA CITY POLICE OFFICERS 1 THROUGH 4, individually and in their official capacities,<br><br>Defendants. | Case No. CJ-2026-515<br><br>Judge Don Andrews<br><br>**JURY TRIAL DEMANDED** |

## SECOND AMENDED COMPLAINT

EXHIBIT
tabbies
1

COMES NOW the Plaintiff, Anthony Trupia, pro se, pursuant to the leave to amend granted by this Court on August 10, 2026, and for his Second Amended Complaint against the above-named Defendants states and alleges as follows:

## PRELIMINARY STATEMENT

1. This is a case about a two-tier city. In one tier, a small circle of officials, trustees, contractors, and their trade association converts Oklahoma City's public money into private benefit through a procurement channel that operates outside the notice and competition state law requires. In the other tier, the residents who fund that money — and in particular the residents of Oklahoma City's poorer neighborhoods — receive between inadequate and no city services, and when they complain, the City services the complaint on paper and never fixes the condition.

2. Plaintiff lives in the second tier. His house was connected to the wrong, defective city water line, which built up pressure, burst underground, flooded his crawlspace, and grew mold under his bedroom, while the City overbilled him at four to eight times his historical usage for a year, handed him self-help questionnaires, told him to hire his own plumber, left a door notice stating, in substance, that there was no problem on the city's end, and — when he presented a modest claim — was told by the City's claims attorney that the City would do nothing about his damages beyond a refund of roughly $600 in overbilling, and that he should pack up and go somewhere else.

3. The failure at Plaintiff's home was not an isolated mishap. It occurred on a water system whose reported main breaks ran 591 in FY2023, 621 in FY2024, and 1,101 in FY2025; whose operators had held detailed knowledge of its hydraulic vulnerabilities for more than a decade; and whose repairs are purchased through a standing emergency procurement channel — ninety-four emergency declarations in eight years, roughly one a month, every month — that suspends public notice, confines the bidding to a closed pool of a dozen certified firms, and routes the resulting awards for ratification to a board of trustees whose campaigns are funded by the political action committee of the awardees' own trade association.

4. The same two-tier structure governs the City's other services in Plaintiff's neighborhood. When Plaintiff reported a dead animal, the City removed it within five days and closed the case with a named employee. When Plaintiff reported dogs running loose through his neighborhood — dogs that today prevent him from so much as jogging around his own block — and when he filed approximately fifty noise complaints against ongoing, hours-long, roughly 100-decibel violations, the City acknowledged every complaint, issued

case numbers, sent "extra patrols," issued exactly one citation in the entire sequence — a citation for which Plaintiff was told hearing dates could change and for which no hearing notice ever came — and fixed nothing. Officers responded in person on multiple occasions; on scene, they offered reasons not to enforce. The City's own Action Center and the Mayor's own Chief of Staff each instructed Plaintiff, in writing, to call the police when violations occurred.

5. Plaintiff followed those instructions. On June 6, 2026 — three days after this Court accepted Plaintiff's First Amended Complaint against the City — Oklahoma City police officers responding to Plaintiff's own noise complaint detained the complainant against his own vehicle, held his hands behind his back, and subjected him to a search of his person that included the manipulation of his genitals, before releasing him without arrest, citation, or the generation of any incident report. In approximately fifty prior complaints, nothing of the kind had ever occurred.

6. When Plaintiff sought the records of that encounter and of the water system's operation under the Oklahoma Open Records Act, the City ignored his requests for months, and then, in August 2026, gave two irreconcilable answers about the same record: it told Plaintiff, seven times in a single document, that no record of the June 6 encounter existed — two days after its own records unit had located the record at the request of a different requester — and it then gave that other requester the record's identifying number while denying Plaintiff's request on entirely different grounds. As to the water, contracting, and governance records, the City refused to process the request under the Act at all, announcing that because Plaintiff had sued the City, his statutory rights as a citizen would be treated as litigation discovery due whenever the City chooses to answer.

7. Plaintiff brings this action as a member of the lower class in Oklahoma City, with a higher bar for using his own court system, in what the Legislature made a notice pleading state. The two tiers extend into this courthouse. In April 2026, a represented plaintiff, Melissa Brake, sued Defendant Matthews Trenching Co., Inc. — the same defendant named here, with the same registered agent — for wrongful death, in a petition of six numbered paragraphs whose entire factual account of the events is a single sentence: "Defendants' negligent acts and omissions caused a catastrophic collision." No party moved to dismiss that petition for want of defendant-specific facts, and the court granted her emergency ex parte relief within minutes of filing. Plaintiff's petition in this case pleaded the same defendant's role in greater detail than that sentence — and drew fourteen motions to dismiss demanding a federal "plausibility" pleading standard that Oklahoma has never adopted.

8. This Second Amended Complaint is a speaking complaint. It is long because the record is long, and because the Defendants' fourteen motions demanded specificity: it therefore pleads, with dates, dollar amounts, project numbers, and the Defendants' own recorded words, who did what, when, for how much, and at whose expense.

9. The relief this action seeks is aimed with care. Compensatory relief is sought from all Defendants for Plaintiff's own injuries. Punitive relief is sought only from the individual Defendants whose conduct fell outside the good-faith scope of any office, and from the private companies that profited — not from the City or the Trust, whose liabilities land on the same ratepayers and taxpayers who already funded the failure once. Injunctive and declaratory relief is sought to make the water system safe, to produce the public records the law already makes public, and to end the practices described below.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action pursuant to 12 O.S. § 133, as the claims arise under Oklahoma common law and statutes, including negligence, nuisance, breach of contract, fraud and misrepresentation, unjust enrichment, civil conspiracy, assault, battery, false imprisonment, and intentional infliction of emotional distress; the Oklahoma Governmental Tort Claims Act, 51 O.S. § 151 et seq. (the "GTCA"); the Oklahoma Open Records Act, 51 O.S. § 24A.1 et seq. (the "ORA"); inverse condemnation under Article II, § 24 of the Oklahoma Constitution; and 42 U.S.C. § 1983, over which the courts of this State exercise concurrent jurisdiction. The amount in controversy exceeds the jurisdictional minimum.

11. This Court has personal jurisdiction over all Defendants, as each Defendant is either a resident of Oklahoma, conducts business in Oklahoma, or has committed tortious acts within Oklahoma causing injury to Plaintiff in Oklahoma County.

12. Venue is proper in Oklahoma County pursuant to 12 O.S. § 134, as the causes of action arose in Oklahoma County, the City of Oklahoma City (the "City") is located in Oklahoma County, and a substantial part of the events or omissions giving rise to the claims occurred in Oklahoma County.

## OPERATIVE PLEADING HISTORY

13. Plaintiff initiated this action on January 21, 2026. On March 24, 2026, Plaintiff filed a Motion for Leave to File First Amended Complaint together with the proposed pleading, and on March 25, 2026, this Court entered an order granting leave to amend.

14. By Order file-stamped June 3, 2026, this Court ordered that Plaintiff's First Amended Complaint "is deemed filed as of the date of this Order," directed the Court Clerk to enter it upon the docket, and provided that it relates back to the original Complaint pursuant to 12 O.S. § 2015. The First Amended Complaint thereupon became the operative pleading.

15. On August 10, 2026, this Court granted Plaintiff leave to amend, with twenty days to file an amended pleading. This Second Amended Complaint is filed within the period allowed and pursuant to that leave, and supersedes the First Amended Complaint as the operative pleading.

## PARTIES AND DEFINED TERMS

16. Plaintiff Anthony Trupia is an individual residing at 605 SE 21st Street, Oklahoma City, Oklahoma County, Oklahoma, and is a ratepayer and customer of the City's water utility services. Plaintiff purchased his home — an approximately 800-square-foot house in one of Oklahoma City's poorer neighborhoods — with the money he had, and he cannot pick it up and move it.

17. Defendant City of Oklahoma City is a municipal corporation organized under the laws of Oklahoma, responsible for the provision of water utility services to residents, including Plaintiff, and the ultimate overseer of the water infrastructure system at issue. The City is also the municipal employer and principal of the Oklahoma City Police Department ("OKCPD") and of the Action Center, animal welfare, and code enforcement functions described below.

18. Defendant Oklahoma City Water Utilities Trust ("OCWUT") is a public trust created under Oklahoma law, of which the City is the sole beneficiary, operating as a distinct legal entity that holds the City's water utility assets, issues revenue bonds, and manages the water utility as a proprietary enterprise. OCWUT is governed by five trustees; per the City's own appointee roster, its trustees during the relevant period have been Defendant James D. Couch (Chairman), citizen trustee Sharon Voorhees, Councilmember Bradley Carter, Defendant Mark Stonecipher (sitting as the designated surrogate voting the Mayor's seat), and Brent Bryant (sitting as the designated surrogate voting the City Manager's seat). Every emergency contract ratification described in this pleading required four affirmative trustee votes.

19. Defendant Chris Browning is an individual residing in Oklahoma. At all relevant times he has held three offices at once: (a) Utilities Director of the City; (b) General Manager of OCWUT — the officer who declares the emergencies described below and

who awards the resulting contracts before any trustee vote; and (c) Vice Chair of the City's Prequalification Review Board — the five-member board that decides which firms are permitted to bid on City and Trust water work at all. Browning had direct operational responsibility for the water system's design, maintenance, and operations, including the operational decisions bearing on hydraulic transients described below, and he personally serves as national Secretary of the Association of Metropolitan Water Agencies, whose conferences are sponsored by Defendants Carollo Engineers and Black & Veatch.

20. Defendant James D. Couch is an individual residing in Oklahoma, serving as Chairman and Independent Trustee of OCWUT — the only trustee seated in his own name — a licensed Professional Engineer, former City Manager of Oklahoma City (2000–2018), and former Water/Wastewater Director, who architected the current utility strategy and possesses technical knowledge of hydraulic surge risks, including more than a decade of surge and corrosion studies delivered to the utility during and after his tenure. Couch separately holds a seat on the board of directors of the Greater Oklahoma City Chamber through his own company, JDC Consulting, LLC.

21. Defendant David Holt is an individual residing in Oklahoma, serving as Mayor of Oklahoma City and OCWUT Trustee, with appointment power over roughly 500 positions on some sixty City boards, trusts, and commissions, and with oversight of the capital program benefiting the vendor network at issue. Holt does not personally attend the water trust he is a trustee of; by standing practice he is represented on OCWUT and on the McGee Creek Authority by a surrogate — Defendant Stonecipher — who casts the Mayor's vote. Holt's mayoral campaigns have received $12,000 from the political action committee of the Oklahoma Municipal Contractors Association — the trade association of the contractors whose emergency awards his trust ratifies — including $5,000 paid on December 5, 2025, during the pendency of this case. Holt has served since July 2023 as Dean of the Oklahoma City University School of Law.

22. Defendant Mark Stonecipher is an individual residing in Oklahoma, serving as City Councilmember for Ward 8 and as OCWUT Vice Chairman and surrogate trustee casting the Mayor's vote on OCWUT and the McGee Creek Authority. Stonecipher holds six City appointments in all, including three of the water-supply governance bodies (OCWUT, the McGee Creek Authority, and the Lake Atoka Reservation Association), and formerly chaired the City's Board of Adjustment. He is a shareholder and director of the Fellers Snider law firm, where his first-listed practice area is Water Law and where the firm has publicly listed OCWUT among its representative clients; he is a forty-year water lawyer who understood the governance structures described below. His council campaigns have received $9,500 from the Oklahoma Municipal Contractors Association PAC (2015,

2019, 2023). Ward-designated appointive seats are filled on the nomination of the ward's councilmember, and it is through Stonecipher's Ward 8 that Defendant Don E. Noble holds his seat on the City Planning Commission.

23. Defendant Craig Freeman is an individual residing in Oklahoma, serving as City Manager and OCWUT Trustee (through his designated surrogate). Freeman is the City's construction purchasing agent under OKC Mun. Code § 2-891 (acting through his designee), the promulgator of the administrative "Guidelines and Procedures for Professional Consultant Selection" through which the engineering Defendants are retained under OKC Mun. Code § 2-901(2), and the officer whose designee (Brent Bryant) sits on both the Prequalification Review Board and, as surrogate, on OCWUT.

24. Defendant Don E. Noble is an individual residing in Oklahoma, President and co-owner of CIMARRON CONSTRUCTION CO., LLC, a primary emergency repair contractor profiting from the "Break-Fix" cycle described below. Noble holds two City land-use appointments: he is the Ward 8 representative on the City Planning Commission — a seat filled through Defendant Stonecipher's ward — and from that seat he sits as the Planning Commission's designee on the City's five-member, quasi-judicial Board of Adjustment. Noble is a Lifetime Director of the Oklahoma Municipal Contractors Association.

25. Defendant Gary Matthews is an individual residing in Oklahoma, owner of MATTHEWS TRENCHING CO., INC., a key emergency response contractor profiting from system failures, holding at least seven emergency awards in the period described below.

26. Defendant Rick Thompson is an individual residing in Oklahoma, owner of WYNN CONSTRUCTION CO., INC., an entrenched vendor and political donor profiting from major infrastructure projects. The company he owns holds, among other awards, the single largest OCWUT award identified in this pleading: Project WC-1010, $79,938,000 (July 15, 2025).

27. Defendant CAROLLO ENGINEERS, INC. is a corporation doing business in Oklahoma, serving as the utility's primary consulting engineer for surge-prone designs, including the Hefner Water Treatment Plant ozone retrofit, with long-held knowledge of surge risks. On Project WT-0151 — the $44,432,000 Hefner ozone expansion built by Defendant Crossland — Carollo held design, construction management, and inspection at once, a self-certifying loop in which the entity certifying that the work conformed to the plans was the same entity that drew the plans, and in which, under 61 O.S. § 123(A), the

supervising engineer's certification is the precondition to every payment. Carollo appears in approximately sixty-four engineering items on OCWUT agendas from 2019 through 2026, the large majority of them fee amendments to existing contracts rather than newly competed engagements — including Amendment No. 1 on Project WT-0151 alone, increasing its fee by $2,719,400. Carollo also serves as consultant to the Oklahoma Water Resources Board on the 2025 update of the state Comprehensive Water Plan — an advisory seat inside the state body that would otherwise function as an independent check on municipal water systems — and describes itself in its own marketing as serving "as owner advisor, prime design-builder, design subconsultant, or general contractor depending on project needs."

28. Defendant BLACK & VEATCH CORPORATION is a corporation doing business in Oklahoma, responsible for corrosion control and chemical analysis for the utility, supplying data over more than a decade documenting degraded pipes vulnerable to pressure surges. Its role in the system is that of knowledge supplier and professional-services provider whose contractual instruments are held on the City side or in sub-consultant postures; the corrosion and degradation knowledge it supplied is pleaded in Part Two below.

29. Defendant CROSSLAND HEAVY CONTRACTORS, INC. is a corporation doing business in Oklahoma, the prime contractor on Project WT-0151, the $44,432,000 Hefner Water Treatment Plant Ozone System Expansion/Upgrades — a contract Crossland has admitted in its Answer in this case — whose construction period coincides with the system's break-rate escalation described below. While building that project, Crossland also received the first water emergency award of the series described below: Project WE-0101, a no-bid emergency loop repair at the same Hefner plant, awarded and finally accepted at a single trustee meeting.

30. Defendant ARCHER WESTERN CONSTRUCTION, LLC (The Walsh Group) is a corporation doing business in Oklahoma, contracted for surge tower rehabilitation and holder of Project WT-0201 ($26,909,100), profiting from offline safety systems during transient events. While on the Draper clearwells project (WT-0159), Archer Western twice received no-bid emergency work at the same plant: a $448,002.14 emergency in September 2022 whose memorandum records that it was "deemed beneficial to award the emergency directly to Archer Western," and Project WE-0102, a $1,376,085 emergency rehabilitation at Draper in May 2023, with bidding waived.

31. Defendant WYNN CONSTRUCTION CO., INC. is a corporation doing business in Oklahoma, a default builder for water projects, prequalified at a bonding

capacity of $100,000,000 single and $337,500,000 aggregate, and holder of, among others: Project WC-1010, $79,938,000 (the largest OCWUT award identified in this pleading); Project WT-0221-1, $11,632,294; Projects TW-0001-R and TS-0001-R, $7,781,613; Project WT-0273, $3,900,000; Project ST-0137, $8,510,014; and emergency Project SE-0068, $138,000, awarded and finally accepted at the same August 4, 2026 trustee meeting.

32. Defendant CIMARRON CONSTRUCTION CO., LLC is a corporation doing business in Oklahoma, dominant in emergency repairs, and the holder of the citywide unit-price small-diameter water main repair contracts (Projects WY-0065/SY-0032, not to exceed $2,500,000, renewed as WY-0067/SY-0034, not to exceed $2,100,000), two no-bid on-call emergency awards totaling $1,065,691 (SC-1121, $744,976.43; WC-1129, $320,715.35), a share of the $875,000 no-bid May Avenue transmission-main repair, and a three-year citywide emergency pricing agreement (OCWUT00091) running November 21, 2024 through November 20, 2027 — while winning one of the eight emergency solicitations it actually bid.

33. Defendant MATTHEWS TRENCHING CO., INC. is a corporation doing business in Oklahoma, a beneficiary of the system's failures through high-volume emergency work, including emergency awards SE-0048 ($1,161,500, October 25, 2022), SE-0051 ($272,670), SE-0054 ($173,100), SE-0057 ($225,500, bidding waived), SE-0061 ($662,100), SE-0062 ($350,000), and WE-0104 ($164,900) — thirteen emergency bids, four competitive wins, and one no-bid award in the period described below.

34. Defendant KRAPFF-REYNOLDS CONSTRUCTION COMPANY is a corporation doing business in Oklahoma, a specialized emergency responder repeatedly awarded work through the emergency channel, including SE-0047 (ratified at $4,892,587 and reduced by change order of $2,397,622 at the same meeting, for a net of approximately $2,494,965), SE-0049 ($244,452), WE-0100 ($180,000 — whose supporting memorandum states the emergency contract was "necessary due to a staff shortage"), SC-1087 ($1,222,002), and TS-0007 ($1,298,270). Its President, James L. King, is Vice-President of the Oklahoma Municipal Contractors Association, and Fred Krapff is an OMCA Lifetime Director and a documented contributor to the OMCA PAC.

35. Defendants JOHN DOE OKLAHOMA CITY POLICE OFFICERS 1 through 4 are the OKCPD officers and supervisors who participated in, supervised, or ratified the detention and search of Plaintiff on June 6, 2026, described in Part Six below. Their identities are known to the City, which has refused to disclose them; on information and belief they include Officer Carlos Vasquez and Lieutenant Townsend. They are sued

individually and in their official capacities, and Plaintiff will amend to name them upon disclosure.

36. Defined terms. In this pleading: (a) the "Contractor Defendants" are Crossland Heavy Contractors, Inc.; Archer Western Construction, LLC; Wynn Construction Co., Inc.; Cimarron Construction Co., LLC; Matthews Trenching Co., Inc.; and Krapff-Reynolds Construction Company; (b) the "Engineer Defendants" are Carollo Engineers, Inc. and Black & Veatch Corporation; (c) the "Trustee Defendants" are Couch, Holt, Stonecipher, and Freeman, in their capacities relating to OCWUT; (d) the "Individual City Defendants" are Browning, Couch, Holt, Stonecipher, and Freeman; (e) the "Officer Defendants" are John Doe OKCPD Officers 1 through 4; and (f) "OMCA" is the Oklahoma Municipal Contractors Association. Where this pleading attributes conduct to a defined group, it attributes that conduct to every member of the group; where conduct belongs to fewer than all members, the members are named.

## FACTUAL ALLEGATIONS

### Part One — Plaintiff's Injury and the Year of Deflection

37. Beginning in or about August 2024, Plaintiff experienced unexplained escalations in monthly water bills from the City/OCWUT, rising from a historical baseline of approximately $67–$75 to over $270 by November 2024, to $134.43 in December 2024, to $310.52 in April 2025, and peaking at $379.42 in August 2025 — a cumulative overcharge exceeding $2,500. The City's own usage records show Plaintiff's metered consumption jumping from one to two thousand gallons per month through July 2024 to five and seven thousand gallons in August and September 2024, with no change of any kind in Plaintiff's household or habits.

38. Despite diligent self-inspections revealing no household leaks or excessive usage, Plaintiff relied on Defendants' billing representations showing matching "incoming" and "outgoing" water figures, which deterred earlier suspicion of a metering or infrastructure defect.

39. On November 20, 2024, Plaintiff provided formal notice to the City's Utilities Customer Service by email, reporting bills four to eight times historical usage with no evident leak and matching sewer records. The City's November 21, 2024 response, sent by a representative identifying herself as "Angela," did not schedule an inspection; it conditioned any visit on Plaintiff first answering an exhaustive questionnaire about his own property — running toilets, pools, irrigation zones, irrigation start times, household habits — shifting the burden of diagnosing the City's infrastructure onto the customer.

40. Bills continued to escalate through early 2025, resulting in over $1,000 in additional overpayments. On April 10, 2025, Plaintiff renewed notice by email to the City's water address, invoking the City's advertised free-visit policy and requesting urgent assistance. The City's April 14, 2025 response, sent by a representative identifying herself as "Gabrielle," instructed Plaintiff to conduct his own meter test — "Find the meter box in your yard . . . and remove the lid" — and to "call a professional to help determine the cause of the leak." A cursory mid-April on-site visit followed, which concluded with a door notice stating, in substance, that there was no problem on the city's end, without any thorough inspection — negligently missing the defective hookup that was in fact present.

41. In May 2025, Plaintiff hired a licensed plumber at personal expense, who disconnected the city line and confirmed persistent water flow with no household issues. On June 2, 2025, Plaintiff emailed demanding immediate re-inspection, citing evidence of a missing meter (only three meters serving four houses) and a flooded meter hole. The City's June 5, 2025 response forwarded the matter to its Emergency Services Division without urgency or timeline, telling Plaintiff to "contact dispatch" for updates.

42. In June 2025, the City's crew re-inspected the property — but only under Plaintiff's direct, on-site guidance — and the inspection revealed that Plaintiff's house was incorrectly hooked to a defective city connection: a flooded and overflowing line causing pressure buildup that burst underground, flooding Plaintiff's crawlspace with water. The defect directly resulted in mold growth under the home, including directly beneath Plaintiff's bedroom, devaluing the property, requiring remediation, and causing personal injuries including sinus and ear pain from mold exposure.

43. Had Defendants accurately tracked and billed "returned water" (contrary to their representations), conducted a proper initial inspection, or responded promptly to notices, the defect would have been identified and rectified a full year earlier, avoiding over $2,500 in overbilling, crawlspace flooding, mold infestation, property devaluation (estimated at $10,000 or more in remediation), and ongoing health effects.

44. On August 8, 2025, Plaintiff asked in writing for the results of the review the City had promised on his request for a billing adjustment; the City's August 11, 2025 response stated only that the account was "still in the process of being worked." The account review was never closed with Plaintiff. A credit of $68.67 appeared on Plaintiff's September 2025 bill without explanation.

45. On January 9, 2026, in a telephone conversation memorialized by Plaintiff in writing the same day and never rebutted, the City's claims attorney, Chris Hall, confirmed

that he had spoken with the water utility, confirmed — as Plaintiff memorialized in writing the same day, without dispute — that the City did in fact have a leak on its side, and offered Plaintiff approximately $600 as the City's own calculation of the overbilling — an amount that did not cover even the overcharges, let alone the property damage or injuries.

46. In an October 7–8, 2025 exchange likewise memorialized in writing to the City's claims address and never rebutted, Mr. Hall took the position that the City would acknowledge no damages that did not come with receipts and medical records. Plaintiff had told Mr. Hall that he is poor, lives in an approximately 800-square-foot house, could not afford to remediate the mold, and could not afford to lay out money up front to see a doctor for the sinus and ear pain the mold was causing — which is precisely why the receipts and medical records Mr. Hall demanded did not yet exist. Receipts and medical records are not a legal prerequisite to a political subdivision's payment of a tort claim; they are a documentation practice. The City's position converted Plaintiff's poverty itself into the City's defense: because Plaintiff could not afford to pay first for the harm the City caused, the City would treat the harm as unproven. Mr. Hall made clear that the City was not going to do anything about Plaintiff's damages beyond the approximately $600 overbilling figure, and told Plaintiff he should just pack up and go somewhere else — all of which Plaintiff memorialized in writing to the City's claims office on October 8, 2025, without dispute or correction from the City since. Plaintiff has no relatives or friends in Oklahoma with whom he can stay, cannot afford a hotel, and — like every other poor person in his situation — has nowhere else to go.

47. The June 2025 discovery of the defective hookup, the City's own confirmation of some $600 in overbilling, and the City's field crews working on the pipes in front of Plaintiff's house during the very period of these calls, together establish that the City knew of, confirmed, and understated a defect its own system caused — and responded to its poorest documented victim by telling him to leave.

**Part Two — Systemic Failure and Hydraulics**

48. Defendants' conduct toward Plaintiff was foreseeable and exacerbated by systemic failures in the City's water infrastructure, as publicly acknowledged: 591 water main breaks in FY2023, rising to 621 in FY2024 and 1,101 in FY2025 — a 77 percent single-year increase — attributed to aging pipes, corrosion, and underfunding (with only $10 million allocated for replacements until a July 2025 announcement doubling the figure to $20 million, accompanied by Defendant Browning's public statement that fixes "won't happen overnight"). Early September 2025 rains triggered more than forty additional breaks.

49. The escalation in breaks is driven in material part by hydraulic transients ("water hammer") — pressure waves generated by operational decisions, including pump sequencing and valve control logic, under the direct oversight of Defendants Browning, Couch, and OCWUT — rather than by benign aging alone. The Hefner Water Treatment Plant ozone retrofit (Project WT-0151, 2022–2026), contracted to Defendant Crossland Heavy Contractors for $44,432,000, introduced temporary pumping configurations and construction-period operations during the same window in which the break rate exploded, and the first water emergency of the series described in Part Three — a break at the Hefner plant itself — occurred during that construction and was awarded, without bidding, to Crossland.

50. Defendants possessed detailed knowledge of the system's surge vulnerabilities for over a decade, through surge analyses, hydraulic modeling, and interconnect studies prepared by and for the utility — including Defendant Carollo's surge-system design work referenced in the City's own planning documents — and through Defendant Black & Veatch's corrosion-control studies and chemical analyses showing degraded pipes unable to withstand transient pressures. Despite SCADA monitoring capable of capturing transient events, Defendants failed to mitigate these known risks.

51. The "average pressure" framing the utility has offered publicly obscures transient spikes far exceeding average operating pressure, which pass through residential pressure-reducing valves and damage private property — including the pressurized, defective connection that burst under Plaintiff's home. Material vulnerabilities include graphitization in pre-1990s cast and ductile iron pipe and fatigue in later PVC, both amplified by transients. The non-linear explosion of the break rate in FY2025 is inconsistent with steady-state aging and consistent with operational causes.

52. OCWUT's own governing body has adopted, by resolution, the factual premise of these allegations. On April 8, 2025, the Trustees adopted a resolution reciting "the ongoing discovery of an extraordinarily high number of leaks and breaks from the extreme winter weather" as the basis for a standing emergency procurement delegation described in Part Three below. That recital — the City's own contemporaneous characterization, adopted by four trustee votes, in the middle of the 1,101-break fiscal year — is an admission of the systemic failure alleged here.

53. The scale of the digging is itself documented in the Trust's spending: on June 3, 2025, the Trustees raised the "emergency driveway, sidewalk, and mailbox replacement services" pricing agreements held by Parathon Construction LLC and Rudy Construction Co. — the money spent putting back what the repair excavation tore up — twice in a single

resolution, to a total estimated $10,200,000 through June 5, 2026, a figure larger than every competitive emergency construction award in the period combined.

**Part Three — The Emergency Ratification Machine**

***A. The two gates, and the 2020 removal of the rules from public law.***

54. Every dollar of Oklahoma City water and wastewater construction passes through two gates. Gate one is prequalification: under OKC Mun. Code § 13-401(a), any person bidding or performing work on a public construction contract, engaging in work to provide a public improvement, or working on public property in an established class must be prequalified by the City's Prequalification Review Board, and under OKC Mun. Code § 2-871(4) a submission by a bidder who is not prequalified "shall not be considered a bid" at all. Gate two is sealed competitive bidding under the Public Competitive Bidding Act of 1974, 61 O.S. §§ 101–139, which applies to OCWUT directly because a "public agency" expressly includes any public trust, 61 O.S. § 102(5): public construction contracts exceeding $100,000 must be let to the lowest responsible bidder by open competitive bidding after solicitation of sealed bids, 61 O.S. § 103(A), upon notice given electronically and published in a newspaper of general circulation in two consecutive weekly issues, the first at least twenty-one days before bid opening, with notice to an in-state trade publication for work over $100,000, 61 O.S. § 104.

55. Until the end of 2020, the qualification criteria for each class of water work were written into the Municipal Code, where they could be changed only by ordinance, in public, on a recorded Council vote. On December 8, 2020, Ordinance No. 26614 repealed those sections (former OKC Mun. Code §§ 13-402 through 13-417) and moved the criteria into an administrative document — the "Prequalification Classification Categories" — which by its own terms "is subject to revision or amendment by the Prequalification Board at any meeting." Since that date, the rules deciding which firms may compete for Oklahoma City water work have not been law adopted by the elected Council; they have been policy adopted by a five-member administrative board.

56. Defendant Browning sat on that Board when the criteria were moved out of public law and serves as its Vice Chair now — while simultaneously serving as Utilities Director and as OCWUT General Manager, the officer who declares the emergencies described below, awards the resulting contracts before any trustee vote, and thereby selects the recipients from the very list of firms his Board controls. Defendant Freeman, as City Manager, holds the Board seat filled by his designee, is the City's construction purchasing agent under OKC Mun. Code § 2-891, and promulgates the administrative guidelines by which the Engineer Defendants are selected, OKC Mun. Code § 2-901(2). One official

holds the gate, declares the emergency, and picks the invitees; another writes the rules that pick the engineers.

57. The prequalification criteria are not a neutral responsibility screen; they are constructed so that eligibility for the largest work belongs only to firms that already hold it. Under the Prequalification Classification Categories in force April 8, 2026, a firm cannot be prequalified for treatment-plant work (Water Facilities Class "A" — the Hefner class of project) unless it has already built two projects of at least 20 million gallons per day or $25,000,000 each within the last ten years, on $20,000,000 aggregate bonding — a closed loop by construction, in which the qualification for building the big project is having already built big projects. A newcomer holding a "provisional" classification may work only one project in that class at a time and may not bid another until the Board — whose Vice Chair directs the department supervising the job — confirms the current project was completed "fully and punctually." The annual fee schedule charges out-of-state firms four times the local rate, per classification. And among the Board's express, discretionary assessment criteria is a firm's "[h]istory of complaints and litigation" — a criterion that operates as a standing deterrent to any contractor in the pool who might otherwise complain about, or testify concerning, the practices described in this pleading.

58. In six years of published agendas (2020–2026, seventy-six agendas read), the Prequalification Review Board has granted 978 approvals and issued zero revocations and zero suspensions, notwithstanding its express power to suspend, limit, condition, and revoke. The gate has never once been used against an insider.

***B. Ninety-four declared "emergencies" in eight years — a standing procurement channel with its own numbering.***

59. Between February 2019 and August 4, 2026, OCWUT's Trustees ratified ninety-four emergency declarations — by year: 8 (2019), 14 (2020), 12 (2021), 10 (2022), 16 (2023), 16 (2024), 11 (2025), and 7 through August 4, 2026. That is roughly one declared emergency a month, every month, for eight years. The emergencies run on their own consecutively numbered capital project series — emergency sanitary sewer projects SE-0043 through SE-0068, and emergency water projects WE-0090 (September 2019) through WE-0112 (April 2026), with sewer emergencies before 2022 running on SC-numbers. An agency does not maintain a consecutively numbered, continuously budgeted project series for events it does not expect. The emergency series is a standing procurement channel — a budget line, not a surprise.

60. Oklahoma law defines the entire power being exercised in a single sentence: "Emergency as used in this section shall be limited to conditions resulting from a sudden

unexpected happening or unforeseen occurrence or condition whereby the public health or safety is endangered or further damage to state property is likely if the situation is not addressed promptly." 61 O.S. § 130(F). The definition has two components — a qualifying occurrence (sudden, unexpected, unforeseen) and a resulting danger — and both must be present.

61. One of those two statutory qualifications is conspicuously absent from the City's own supporting documents. All seventy staff memoranda supporting these declarations that appear in the published packets — the memoranda from Defendant Browning to the Trustees that sit behind every ratification resolution — were searched in full text. The recited public-health element of the definition appears thirty-seven times. The suddenness element appears never: zero of seventy memoranda contain the word "sudden"; zero contain "unforeseen"; zero contain "unexpected"; zero contain "urgent." The City recites the consequence side of the statute and omits, in every single instance across eight years, the qualifying occurrence that makes a condition an emergency at all.

62. What the memoranda say instead is a statement about staffing, not suddenness. The recurring house formula — appearing nineteen times — is that repairs were "beyond the immediate resources of the Line Maintenance Division; therefore, an emergency was declared." The memorandum for Project WE-0100 says it outright: "The emergency contract is necessary due to a staff shortage." A crew-capacity shortfall is a budgeting and staffing condition, foreseeable by definition; it is not a sudden unexpected happening within 61 O.S. § 130(F).

63. Individual items break the definition on their own facts. The largest emergency in the file, Project SE-0047 (ratified at $4,892,587), is described in its own supporting memorandum not as a failure at all but as a capacity upgrade: the existing sewer "cannot accommodate existing and planned sanitary sewer flows in the area and needs to be replaced" — infrastructure sized for planned growth, procured as an "emergency." A $1,900,000 blower "emergency" at the Deer Creek Wastewater Treatment Plant was ratified on February 13, 2024, for failures its own memorandum dates to March 5, 2020 — one thousand four hundred forty days earlier, with the purchase-order numbers in the caption (03052020WB01; 02162021DDM02) encoding the true dates on their face. And a three-year, citywide, bonded, multi-vendor pricing agreement with a stated annual cost — the opposite of a sudden unexpected happening — was awarded under an emergency declaration in December 2024, as pleaded below.

***C. What the emergency declarations actually purchased: not speed, but silence.***

64. Of the fifty emergency ratifications from January 2023 through August 2026 (the period for which complete packets were reviewed), twenty-six kept competitive bidding and dropped public notice — their captions "approving the bidding documents, approving Addendum No. 1, and awarding a contract" to the low bidder; twenty waived bidding outright; two were routed through existing City on-call contracts; and two ratified emergency purchase orders with no bidding recital either way. The emergency declarations on the twenty-six bid items did not buy speed — as pleaded below, the awards took twenty to ninety-eight days to reach the Trustees. What the declaration suspended, in practice, was 61 O.S. § 104: the published newspaper notice that tells the public, and every contractor outside the circle, that the work exists.

65. The City's own memoranda prove the silence. Across all forty-eight memoranda supporting these items, the words "publish," "published," "publication," "newspaper," "notice," "invitation," and "invited" appear zero times, with a single exception described in the next paragraph. Twenty-five of the twenty-six bid emergencies record only that "Addendum No. 1 was issued to prospective bidders" — a phrase that presupposes a known, pre-existing list of recipients rather than a public that was told. Not one memorandum in the entire set discloses the engineer's cost estimate, although 61 O.S. § 116(B) makes that estimate expressly non-confidential — meaning the Trustees ratified tens of millions of dollars in emergency awards without ever being told, in any packet, what the work was supposed to cost.

66. The enclosure is completed by the City's own published bid records. The City publishes Bid Committee tabulations for its construction bidding at okc.gov — 282 tabulation files, spanning every OCWUT capital and unit-price series. The number of SE- (emergency sewer) tabulations among the 282 is zero. The number of WE- (emergency water) tabulations is zero. Every other series is present; only the two emergency series are absent. A member of the public who wished to learn who bid Oklahoma City's emergency water and sewer work, and for how much, could not have found out from any bidding record the City publishes.

67. The General Manager has described the mechanism in his own words. The April 8, 2025 memorandum, over Defendant Browning's authority, states: "The General Manager declared an emergency to exist. The General Manager waived competitive bidding and solicited informal competitive bids from prequalified bidders for waterline and water service repair contracts, each with a not to exceed amount of $2,000,000." Bidding waived; solicitation informal; recipients drawn from the prequalified list controlled by the board he vice-chairs. That sentence, written by the official who holds all three relevant offices, is the architecture of the channel in twenty words.

68. The one time OCWUT advertised an emergency solicitation, the advertisement worked — and the record of it shows what the other twenty-five suppressed. For the December 17, 2024 three-year citywide pricing agreement, the memorandum records: "OCWUT advertised specifications in the Journal Record and posted in the electronic bidding system. Twenty-nine potential bidders viewed the bid with three vendors submitting bids. . . . A non-responsive bid was received from RUTS Construction. RUTS Construction is not a Pre-Qualified Contractor." Publication produced twenty-nine interested firms. Three bid. One of the three was excluded — not on price, not on capacity, but on prequalification status alone — and the three-year citywide contract went to the two firms left standing: Defendant Cimarron, whose owner is an OMCA Lifetime Director, and Southwest Water Works, LLC, whose owner had just completed his term as OMCA's President. Twenty-six firms looked at a three-year citywide water repair contract in Oklahoma's largest city and did not bid; that is the shape of a market in which outside firms have concluded there is no point.

***D. The closed pool, and the bids that do not behave like competition.***

69. Twelve firms account for every bid on every emergency solicitation across the forty-three months for which complete tabulations exist, and no firm outside those twelve bid an emergency even once: Matthews Trenching (13 solicitations bid), Krapff-Reynolds (11), Urban Contractors, LLC (9), Cimarron (8), Downey Contracting, LLC (8), Jordan Contractors (6), Brewer Construction Oklahoma, LLC (6), Southwest Water Works, LLC (4), United Trenching, Inc. (4), 4M Trenching, LLC (2), Luckinbill Construction Co., LLC (1), and Civil Builders, LLC (1). Ten of the twelve are OMCA members and six hold OMCA governance seats. The bonding capacity across the pool spans from $5,000,000 aggregate to $300,000,000 aggregate — a sixty-fold spread that makes the "pool" a set of tiers certified annually on a consent docket, not peers competing on equal footing.

70. The bids themselves do not carry the signature of contested pricing. Across the twenty emergency solicitations with complete tabulations, the gap between the winning bid and the second bid has a median of 41.3 percent and a mean of 45.3 percent; only two of twenty solicitations produced a second bid within ten percent of the winner; and the spread from low bid to high bid has a median of 97 percent, exceeding 200 percent on three solicitations and reaching 413 percent on Project SE-0058, where one prequalified firm bid $209,195 and another bid $1,072,938 for the same scope on the same plans. Certified specialist contractors pricing identical work do not miss each other by a factor of five when each bid is seriously intended to win.

71. The distribution of the work inverts what competition would produce. The firms with the worst competitive records in the emergency pool hold the largest volume of never-competed work: Southwest Water Works — zero wins in four emergency bids — holds the citywide unit-price lead service line replacement contract (WC-1141, not to exceed $2,100,000), a three-year citywide pricing agreement (OCWUT00092), and a share of the $875,000 no-bid May Avenue repair. Defendant Cimarron — one win in eight emergency bids — holds both citywide unit-price small-diameter repair contracts, two no-bid on-call awards totaling $1,065,691, the companion three-year pricing agreement, and a share of the same May Avenue repair. Rudy Construction — which has never bid an emergency at all — holds the citywide unit-price pavement restoration contract and shares the restoration pricing agreements raised to an estimated $10,200,000. Whatever is distributing this work, it is not success in competition.

***E. The incumbent's phrase, and the designed instrument.***

72. A house phrase recurs seven times across the emergency memoranda — "it was deemed beneficial to award the emergency directly to" the named contractor — and in four of the seven instances the recipient was the firm already mobilized on an adjacent capital project at the same site: Downey Contracting at the Hefner surge project (WE-0094, $220,168.54); Brewer Construction on an adjacent storm water project (WE-0095, $155,343.52 — an item in which nothing failed at all; a City water main conflicted with the City's own proposed storm drain, and the conflict was resolved by declaring an emergency and paying the contractor already on the job); Defendant Archer Western at the Draper clearwells (WE-0097, $448,002.14); and Defendant Crossland at the Hefner ozone project (WE-0101, $24,545.39). The practice placed the two largest treatment-plant contractors in this case on no-bid emergency awards at the very plants they were already building.

73. On Project SE-0047, the emergency channel awarded both halves of the same project to firms inside the association: the engineering went no-bid to Kimley-Horn & Associates, an OMCA engineer member firm, for $350,840 (November 8, 2022), and the construction went to Defendant Krapff-Reynolds — whose president is OMCA's Vice-President — at $4,892,587 on a two-bid tabulation (February 28, 2023), reduced by $2,397,622 by change order at the same meeting. The emergency declaration on the engineering half accomplished nothing lawful that needed accomplishing: professional services are already exempt from competitive bidding under 61 O.S. § 102(6) and OKC Mun. Code § 2-901, so the declaration was unnecessary to award the engineer without competition — and was made anyway.

74. The unit-price contract is the designed instrument of the cycle. Ordinary change orders are capped by statute — 15 percent cumulative on contracts of $1,000,000 or less, and the greater of $150,000 or 10 percent above that — and growth beyond the caps requires re-advertisement of the incomplete work. 61 O.S. § 121(A)–(C). But "[i]f a construction contract contains unit pricing, and the change order pertains to the unit price, the change order will not be subject to" those caps. 61 O.S. § 121(J)(1). A citywide unit-price repair contract is therefore the one contract form in Oklahoma public construction that grows automatically with every new failure and never re-competes because of its growth. The four citywide unit-price instruments — small-diameter water main repair, lead service line replacement, and pavement restoration — are held by Cimarron, Southwest Water Works, and Rudy Construction. The more the system breaks, the more the holders bill, without another bid ever being taken. That is the "Break-Fix" incentive pleaded in this case, stated in statutory terms: the Legislature wrote the exemption, and the City parked its most failure-driven work inside it, with the firms that lose or never enter open competition.

***F. The delegation cap, the blanket resolution, and the after-the-fact votes.***

75. The Public Competitive Bidding Act permits a governing body to suspend notice and bidding for an emergency only by a two-thirds vote of all its members, and permits delegation of that power to the chief administrative officer only for "contracts less than One Hundred Fifty Thousand Dollars ($150,000.00) in amount." 61 O.S. § 130(A)–(B). That ceiling is itself new and generous: effective November 1, 2022, the Legislature more than quadrupled it, from $35,000 to $150,000. Every emergency item in this record is styled as a ratification of a declaration already made, and an award already issued, by the General Manager — and forty-seven of the fifty ratifications from 2023 through August 2026 exceed even the enlarged $150,000 cap, many by an order of magnitude, up to $4,892,587: more than thirty times the ceiling the Legislature had just raised. The only compliant items are three repairs ($24,545.39; $129,129; $138,000) that fit under the cap by accident of size, processed on the identical template as the multi-million-dollar items around them.

76. The timing arithmetic forecloses any suggestion that the after-the-fact structure reflects urgency. On the twenty dated items, the interval from bid opening to trustee ratification — a strict floor on the interval from declaration to ratification, since the declaration necessarily precedes the solicitation — runs from 20 to 98 days, with a mean of 33: the $4.89 million SE-0047 "emergency" was already out for bids in mid-November 2022 and was not ratified until February 28, 2023, 98 days after bids opened. Not one of the twenty dated emergencies reached the Trustees within even ten days of bid opening. On several items, addenda revising the plans issued one day before bids were due. On three

occasions — WE-0101 (Crossland, Hefner), SE-0067 (Brewer, bidding "and selection procedures" waived), and SE-0068 (Wynn) — the Trustees ratified the award and accepted the fully completed project in the same agenda item, meaning the declaration, award, construction, completion, and final acceptance all occurred before the governing body ever saw the transaction. And on Project SE-0065, the re-bid solicitation was opened seventeen days before the Trustees voted to reject the original bids it replaced.

77. The resolutions themselves are undated where it matters. Every ratification resolution in the record is built on a common template that recites that "the General Manager declared an emergency to exist" — with no date for the underlying failure, no date for the declaration, and no date for the emergency work order. The only date the instrument carries is the date of the trustee vote. State law requires the chief administrative officer to report each emergency declaration, with the governing body's minutes, to the State Construction Administrator within ten days, and requires the Administrator to compile an annual report of all declared emergencies to the Governor, the President Pro Tempore, and the Speaker, 61 O.S. § 130(G); the City's ordinance requires the declaration and its reasons to reach the governing body within ten days and be recorded in the minutes, OKC Mun. Code § 2-872(b). No § 130(G) annual report is published for any year, and compliance with the ten-day requirements cannot even be assessed from the City's public record, because the public record does not contain the date of a single declaration.

78. On April 8, 2025, the structure stopped pretending to be retrospective. The Trustees adopted a resolution — on the recital of "an extraordinarily high number of leaks and breaks" — that prospectively authorized the General Manager "to receive and open bids and to award and approve contracts with the lowest responsible bidders, not to exceed $2,000,000 per contract," for emergency waterline repairs, without further trustee action. That is a standing delegation of award authority at more than thirteen times the $150,000 statutory ceiling. The same resolution directed the General Manager to advertise for annual on-call repair contracts — a concession, in the same sentence, that the "emergency" work is a permanent, planned category of the utility's business.

79. And in December 2024, the emergency power was used to erect a three-year procurement plan: a resolution ratifying an emergency declaration and awarding citywide pricing agreements to Cimarron (OCWUT00091) and Southwest Water Works (OCWUT00092) for repair of 4-inch to 12-inch water mains, with performance bonds and an estimated annual cost of $1,000,000, running November 21, 2024 through November 20, 2027. A bonded, multi-year, citywide, fixed-price procurement plan is the categorical opposite of "a sudden unexpected happening or unforeseen occurrence."

***G. The gate binds outsiders and never binds the City: the RUTS sequence.***

80. In February 2024, OCWUT ratified an emergency purchase order of $246,000 to Rangeline Utility Services, LLC dba RUTS Construction, a Texas contractor, for a main break repair at NW 12th Street and Pennsylvania Avenue, with bidding waived — and with no recital in the caption that any emergency was even declared. In September 2024, when inoperable valves prevented the City's own staff from shutting down a 36-inch main at NW 10th and Pennsylvania, a RUTS crew was dispatched to install line stops, and on November 19, 2024, the Trustees ratified an $800,000 emergency purchase order to RUTS, bidding again expressly waived. The next day — November 20, 2024 — bids opened on the one advertised emergency solicitation described above, RUTS submitted a bid, and the City rejected it as non-responsive on the sole stated ground that "RUTS Construction is not a Pre-Qualified Contractor."

81. RUTS appears nowhere in the Prequalification Review Board's published record: zero appearances in all seventy-six published Board agendas, 2020 through 2026 — never applied, never granted, never denied. Neither does Arroyos Concrete LLC, a firm that nonetheless shared in the $875,000 no-bid May Avenue emergency repair of July 2025. Both firms performed emergency public construction work for OCWUT that OKC Mun. Code § 13-401(a) — which reaches "performing work," not just bidding — says requires prequalification. In sum: the City paid an unprequalified out-of-state firm $1,046,000 across two no-bid emergency purchase orders in nine months for work its own staff could not perform, while maintaining, one day after the second payment was ratified, that the same firm was not qualified to submit a bid. A gate that stops outsiders from competing but never stops the agency from buying is not a responsibility screen. It is a control on entry.

***H. The low bid set aside, the Acting General Manager, and what the channel looks like from inside.***

82. On Project SE-0063 (bids opened April 28, 2025), Jordan Contractors bid $295,600 — $177,100 and 37 percent below the eventual award — and the memorandum's entire stated basis for setting the low bid aside is the unexplained phrase "invalid bid." The award went to Urban Contractors at $472,700. Where an award goes to other than the lowest bidder, 61 O.S. § 117 requires the agency to publish a statement of its reasons, place it on file, and open it to inspection, and OKC Mun. Code § 2-879 requires a "full statement of reasons" entered in the City Clerk's records. No such statement appears in the public packet.

83. The $875,000 May Avenue 48-inch transmission-main emergency of July 29, 2025 (Projects WE-0108 and WE-0109, split across Cimarron, Southwest Water Works, and Arroyos Concrete, bidding waived) was declared not by the General Manager but by an unnamed "Acting General Manager" — the only such declaration in the record — and the written designation of that acting authority appears nowhere in the public record.

84. Taken together, the emergency channel operates as follows, on the face of the City's own instruments: declare an emergency (undated, unreported, and — in every one of seventy memoranda — unsupported by the statutory suddenness the definition requires); use the declaration to drop the published notice rather than the bidding; solicit informally from a prequalified list controlled in part by the declaring official; award the work — sometimes to the contractor already standing on the site — before the governing body votes; ratify twenty to ninety-eight days later, at amounts up to thirty times the delegation cap; publish none of it in any bid record the City maintains; and let the citywide unit-price instruments, held by the pool's least competitive members, grow with every new break under a statutory exemption from every cap that would force re-bidding. The residents who fund this channel — Plaintiff among them — paid for competition and received a private allocation among a dozen firms and their association.

**Part Four — The Money and the Interlocks: Who Funds Whom, Who Sits Where, Who Votes What**

85. The allegations in this Part are drawn from state and federal disclosure systems — the Oklahoma Ethics Commission's Guardian filings, the City's own appointee rosters and campaign-finance portal, the organizations' own published membership and governance pages, and federal tax filings — and they are pleaded as documented structure: who funds whom, who sits where, and who votes what.

***A. One trade association contains five Defendants and funds the Trustees who ratify their awards.***

86. The Oklahoma Municipal Contractors Association ("OMCA") is the trade association of the municipal utility contractors of Oklahoma City. Its own published directory lists five Defendant entities as members: Cimarron Construction, Matthews Trenching, Krapff-Reynolds, Archer Western, and Crossland. Its governance is held in part by Defendants for life: Defendant Don E. Noble (Cimarron) and Fred Krapff (Krapff-Reynolds) hold Lifetime Directorships on OMCA's corporate board; James L. King, Krapff-Reynolds' President, is OMCA's Vice-President; and Cimarron separately holds a company-level corporate board seat. Ten of the twelve firms in the closed emergency bidding pool described in Part Three are OMCA members, and six hold OMCA governance

seats. OMCA's associate board seats include INSURICA, a surety and insurance brokerage whose Chairman is simultaneously the 2026 Chair of the Greater Oklahoma City Chamber.

87. OMCA operates a registered Oklahoma political action committee. Per the Ethics Commission's own records of the PAC's sixty-nine disclosed expenditures, the OMCA PAC has paid: to Defendant Holt's mayoral campaigns, $5,000 on December 13, 2017 (the month he became a candidate for Mayor), $2,000 on March 30, 2021, and $5,000 on December 5, 2025 — the last during the pendency of this case, and confirmed from the recipient side by Holt's own campaign's contribution schedule; and to Defendant Stonecipher's council campaigns, $2,000 (February 25, 2015), $2,500 (January 15, 2019), and $5,000 (February 10, 2023) — a total of $21,500 to the two named Defendants who sit as OCWUT trustees. The same PAC has contributed to approximately twenty other Oklahoma City Council campaigns across the same period. The OCWUT trustees are the Mayor and members of the City Council; the emergency ratifications pleaded in Part Three each required four affirmative trustee votes; and the body casting those votes has been funded, broadly and continuously, by the political action committee of the association whose member firms receive the awards.

88. The PAC's money comes from the awardees. Its disclosed contributor side includes Fred Krapff (Krapff-Reynolds, OMCA Lifetime Director), Jimmy Jordan (Jordan Contractors, OMCA Lifetime Director), Kevin Brewer (Brewer Construction, OMCA Lifetime Director), and Paul Matthews (Southwest Water Works, OMCA Immediate Past President) — principals of four firms inside the emergency pool. The circuit is closed and dated on public filings: contractor principals fund the association PAC; the association PAC funds the trustees; the trustees ratify the contractors' emergency awards.

89. The before-and-after is stark on the disclosure records themselves. Across eight years as a state senator (2009–2017), Holt's disclosed receipts from OMCA's orbit totaled a few hundred dollars in small personal gifts from association figures, including its Executive Director. The month he announced for Mayor — the office whose trust ratifies OMCA members' emergency water contracts — the association's PAC wrote him $5,000. As an institution, OMCA also formally endorsed Holt's 2022 re-election, by name, in the Holt campaign's own published release. And at least one sitting Council member and OCWUT trustee appears on both sides of the flow: Councilmember Meg Salyer received $3,500 from the OMCA PAC as a candidate and has made personal contributions to Holt's campaigns, most recently $1,000 on December 29, 2025, during this case.

***B. The engineers and the builders are organized for joint delivery, and the statutory door was opened for them.***

90. Defendants Carollo, Black & Veatch, Archer Western (through its parent, The Walsh Group), and Crossland are all published members of the Water Collaborative Delivery Association — a national body whose entire subject matter is engineer-contractor teaming on collaborative project delivery: construction-manager-at-risk and design-build. Effective July 1, 2021, 61 O.S. § 220.1 authorized design-build delivery — a single contract for design and construction, outside hard bidding — for public water and wastewater systems for the first time. The statutory door opened, and the four Defendants already organized around walking through it together are on this docket. Construction management contracts are likewise statutorily exempt from competitive bidding, 61 O.S. § 217, and professional engineering services are never bid at all, being selected instead under the administrative guidelines Defendant Freeman promulgates.

91. Every bidder on a public construction contract must file a sworn statement disclosing any business relationship, current or within the prior year, with the project engineer, its officers, and directors. 61 O.S. § 108. On Project WT-0151, Defendant Carollo designed the work, managed its construction, and inspected it while Defendant Crossland built it, and both belong to the same collaborative-delivery association; the sworn § 108 statements filed with those bids are public records that either disclose that relationship or do not.

***C. The civic web around the same few people.***

92. The circle described above is held together by a small, interlocking set of civic institutions, documented on the organizations' own pages and filings, in which the same Defendants and their business partners repeatedly meet:

(a) Defendant Cimarron builds athletic fields at cost — by its own website, roughly 65 percent below market, twenty fields of a 44-field program — for Fields & Futures, the charity founded by Tim and Liz McLaughlin, whose construction program is run by Tommy Noble, Defendant Don Noble's brother and Cimarron co-owner; the McLaughlins are published endorsers of Defendant Holt's 2022 campaign. The charity's decade of federal tax filings, which name its interested-party transactions, never once report a payment to Cimarron: the relationship is a sustained in-kind subsidy from a defendant contractor's family company to the charitable project of the Mayor's public endorsers.

(b) One household spans the defendant Trust and the City's land-use bench: Sharon Voorhees is an OCWUT citizen trustee, and her husband Mike Voorhees sits on the five-member Board of Adjustment — beside Defendant Noble. Both Voorhees are published 2022 Holt endorsers.

(c) Defendants Holt and Stonecipher share the Quail Creek neighborhood institutions — Stonecipher as past President of the Quail Creek Homeowners Association and of the Quail Creek Golf & Country Club, Holt as a former Quail Creek HOA board member.

(d) Defendant Holt is a member of the Rotary Club of Oklahoma City (Club 29) and a recipient of its Service Above Self Award; a board member of the Downtown Club of Oklahoma City; a director of the Greater Oklahoma City Chamber — a board Defendants Couch (through JDC Consulting) and Freeman also sit on — and, since July 2023, Dean of the Oklahoma City University School of Law.

(e) The Committee of One Hundred — an invitation-only club whose charitable purpose is financial grants to law enforcement and the annual decoration of Oklahoma City police officers, and whose officers have included a former Oklahoma City police chief — operates as a standing private funding structure around OKCPD, alongside the police union's political alignment pleaded in Part Six.

93. Plaintiff does not allege that membership in a club, a charity, or an association is unlawful, and does not plead these institutions as wrongs. He pleads them because they are the documented rooms in which the officials who govern the water system, the contractors who profit from its failures, and the association that finances the officials' campaigns continuously meet — the connective tissue that explains how a procurement channel this far outside the statutes could run for eight years, roughly monthly, ratified unanimously, without one participant objecting. The full architecture is a subject for discovery; what is pleaded here is confirmed on the organizations' own published records.

94. The general campaign-finance allegation of the First Amended Complaint is now specific: campaign finance shows support from the construction sector to the officials who govern this system, in the dated, itemized form pleaded in this Part — $21,500 from the contractors' association PAC to the two trustee Defendants alone, funded by the principals of the firms inside the closed emergency pool, with the most recent $5,000 paid to Defendant Holt while this case was pending.

**Part Five — Between Inadequate and No City Services: The Same City, Off the Contract Ledger**

95. The City's treatment of Plaintiff's water was not an aberration; it is how the City services his neighborhood generally. The allegations in this Part are drawn from the City's own Action Center intake system — its automated acknowledgments, case numbers, and disposition notices — and from Plaintiff's documented correspondence with the City.

96. What the City fixes: on January 26, 2024, Plaintiff reported a dead cat frozen to the side of the house he had just moved into (Case No. C24-04587). By January 31, 2024 — five days later — the City's Animal Welfare division had removed the animal and closed the case with a named responding employee. The system works when the City wants it to.

97. What the City never fixes: on February 8, 2024, Plaintiff reported dogs running loose through the neighborhood (Case No. C24-07988). The condition was acknowledged, given a case number — and persists to this day. On August 17, 2026, Plaintiff reported — and the City logged under two case numbers, C26-52321 and C26-52322 — that a large, aggressive pit-bull-type dog from the neighboring property at 603 SE 21st Street, which has escaped its property multiple times, was at that moment attempting to attack a smaller dog hiding under Plaintiff's car, and that Plaintiff "can't leave my property now." Because of the City's years-long non-enforcement of its animal-control ordinances in his neighborhood, Plaintiff cannot take a jog around his own block — the ordinary exercise he would otherwise take — without confronting loose, aggressive dogs.

98. The noise: beginning in early 2024 and continuing for years, Plaintiff's immediate neighbors have blasted music — frequently from vehicles parked in their driveways — at roughly 90 to 100 decibels, for hours at a stretch, at times beginning at 6:00 a.m., with heavy low-frequency bass penetrating the walls of Plaintiff's home. Plaintiff has filed approximately fifty complaints with the City regarding these ongoing noise-ordinance violations — through the Action Center, through 911 and the non-emergency line, in writing to the Mayor's office, and in a formal complaint to OKCPD Professional Standards (October 19, 2024). The City's own records confirm the pattern: in its August 2026 records response, OKCPD identified fourteen separate CAD call records for Plaintiff's complaints spanning February 2024 forward, and recorded for eleven of them, in its own words, "No incident report made."

99. The City's response has been to service the ticket and never the condition. Representative dispositions from the City's own system: Case No. C24-13663 (March 4, 2024, music blasting for over two hours at approximately 100 decibels) was closed with the notation "Extra Patrol sent to sector units." Exactly one citation was issued in the entire multi-year sequence — early on. When it issued, Plaintiff was told that the hearing date was subject to change; no one ever followed up with him, and no notice of any hearing was ever sent to him. On information and belief, nothing ever came of the one citation the City issued. Officers responded to Plaintiff's calls in person on multiple occasions; the pattern when they appeared was an on-scene explanation of why nothing would be done — on the night of January 10, 2025, officers told Plaintiff they would take no action unless he could point to the specific source address, while acknowledging that they could themselves hear

the music as they stood there. Warnings were issued repeatedly; enforcement never followed.

100. The City twice instructed Plaintiff, in writing, that the police were the remedy. On May 10, 2024, the Action Center's own representative wrote: "please contact the Police while the loud music is on. An officer can be dispatched immediately to the residence to address the issue." On January 10, 2025, the Mayor's Chief of Staff, Steve Hill, wrote: "Our recommendation would be that you call the police and report noise violations. It appears you've done so. I will check with OKCPD" — in the same message declaring that "The Mayor's Office has no authority to address this matter." The City's answer to a resident it would not protect was: keep calling the police. Plaintiff kept calling the police.

101. The contrast between the two tiers of the City's attention is the point of this Part. The same municipal government that can declare, fund, staff, and ratify a formal "emergency" roughly every month for eight years to purchase repairs from its contractor circle — and that removed a dead animal from Plaintiff's property in five days — has proven unable, across years and approximately fifty complaints, to abate a noise violation its own officers stood and listened to, or to contain the loose dogs that keep Plaintiff off his own street. The services the small circle bills for are always an emergency; the services Plaintiff's neighborhood needs are never even an incident report.

**Part Six — June 6, 2026: The Retaliatory Response**

102. Plaintiff's protected activity, by date: approximately fifty noise complaints (2024–2026); a formal complaint to OKCPD Professional Standards concerning the department's non-enforcement, including an officer's misrepresentation of a citation check (October 19, 2024); written complaints to the Mayor's Chief of Staff and the Assistant City Manager over public safety (January 2025); public criticism of Mayor Holt on the social-media platform X, including on his official account; this lawsuit, filed January 21, 2026; and the First Amended Complaint, deemed filed by this Court's Order of June 3, 2026.

103. The Mayor's office had actual, documented knowledge of Plaintiff and his complaints: Hill's January 2025 correspondence states that he would "check with OKCPD," and Assistant City Manager Jason Ferbrache — the Assistant City Manager whose portfolio includes OKCPD — corresponded with Plaintiff directly about the noise complaints in January 2025. In a window between January 18 and January 31, 2025, Plaintiff was blocked on Mayor Holt's account on X after posting criticism of the City's services to it; Plaintiff complained of the block in writing to the Mayor's Chief of Staff on January 31, 2025, expressly identifying it as government censorship of speech in a public forum, and was subsequently unblocked. The Fraternal Order of Police, Lodge 123 — the

union of the OKCPD's officers — was a published organizational endorser of Mayor Holt's 2022 re-election campaign, listed first among his organizational endorsers.

104. In the early morning of Saturday, June 6, 2026 — three days after this Court accepted the First Amended Complaint — Plaintiff placed a noise complaint, one of the fifty. His telephone log for that morning records ten contacts between 1:23 a.m. and 3:09 a.m. with the OKC Police Department's number, (405) 231-2121, and with the officer-callback number used in connection with the call, including an outgoing call to OKCPD at 1:23 a.m. connected for one minute and thirty-nine seconds.

105. OKCPD officers — on information and belief including Officer Carlos Vasquez, supervised by Lieutenant Townsend — responded at approximately 2:42 a.m. Plaintiff, on his own property, in his night clothes, approached the officers and immediately identified himself as the complainant. Rather than treat him as the complaining party, an officer ordered Plaintiff's hands up, directed him against his own vehicle, and physically held his hands together behind his back — stating aloud, when Plaintiff protested, that this was standard policy for officer safety. The officer then conducted a search of Plaintiff's person that included contact with and manipulation of Plaintiff's genitals through thin clothing. An officer acknowledged aloud that the object in Plaintiff's hand was a vaporizer, not a weapon. Plaintiff memorialized the officers' statements — the officer-safety explanation and the acknowledgment of the vaporizer — in writing to all defense counsel on June 8, 2026 and in his June 11, 2026 notice to the City Clerk, and every word of the encounter is captured on the City's own body-worn cameras. Plaintiff was unarmed, compliant, suspected of nothing, and never arrested or cited. After the search, the officers released him, and Plaintiff went back inside his house.

106. The encounter was captured on the officers' body-worn cameras and, on information and belief, on in-car camera systems, and generated a computer-aided dispatch record the City has since identified as CAD-R 202606-0013672. It generated no arrest, no citation, and — per the City's own August 17, 2026 records response — no incident report of any kind: "Incident reports/citations/supplementals requested do not exist." A detention and bodily search of a named complainant that the department does not even document is itself an expression of the custom pleaded in Part Five: the encounter, like the complaints, was serviced and never recorded.

107. In approximately fifty prior noise complaints, some of which produced in-person police responses, no officer had ever detained, frisked, or touched Plaintiff. What changed between the forty-ninth complaint and this one was not Plaintiff's conduct; it was that Plaintiff's lawsuit against the City, its Mayor, and its water trust had just been accepted

for filing. Persons who call in noise complaints are not, as a class, detained and searched; the noise violators in Plaintiff's neighborhood, across approximately fifty complaints, drew exactly one citation — never prosecuted to any hearing Plaintiff was noticed of — and otherwise only warnings. The one body the City's enforcement machinery closed on, in years of documented violations, was the complainant who had sued it — three days after his amended complaint was accepted.

108. Plaintiff experienced the June 6 encounter as its participants would have intended: as a message about what happens to a poor resident who files complaints and lawsuits against the City. It caused him humiliation, fear, anxiety, and continuing distress, along with the physical indignity of the contact itself.

**Part Seven — The Records Wall: Obstruction, a False Official Statement, and the Reclassification of a Citizen's Rights**

109. Plaintiff has sought the public records underlying this case since September 2025. The City's responses have progressed from silence, to misdirection, to a documented false statement, to a declaration that the Open Records Act no longer applies to Plaintiff because he sued.

110. In September 2025, Plaintiff submitted an ORA request for records including the SCADA pressure logs that would document the hydraulic transients pleaded in Part Two. The City ignored it for four months. On January 9–12, 2026, when Plaintiff pressed the City's claims attorney and claims office in writing, the City's answer was to tell him to start over in an online portal. On January 10, 2026, Plaintiff submitted a renewed formal ORA request; it too went unfulfilled. The ORA requires every public body to provide "prompt, reasonable access" to its records, 51 O.S. § 24A.5, and the City's own auto-reply promises a response "within one business day."

111. On June 11, 2026, Plaintiff served a comprehensive Open Records Act Request and Preservation Demand on the City Clerk, copied to the Municipal Counselor's office and all defense counsel, covering: the body-worn camera, dash camera, dispatch, 911, and CAD records of the June 6, 2026 incident (Part I); Plaintiff's complete noise-complaint call history and the enforcement records for the offending properties (Part II); internal communications about Plaintiff, the OKCPD policies on detentions and frisks, and the records of the social-media block (Part III); Plaintiff's utility account and inspection records (Part IV); the SCADA, surge, and engineering records (Part V); the contracting, ratification, conflict-disclosure, and governance records (Part VI); and tort-claim notices (Part VII). The request renewed the September 2025, October 2025, and January 2026

requests, and included an express litigation hold and preservation demand for the body-camera footage, whose default retention period is limited.

112. The City did not acknowledge the June 11 request for sixty days. It entered the request in its own systems on August 10, 2026 — as ORR-4747-2026 and OCPD-11660-2026 — only after Plaintiff had complained to the Oklahoma Attorney General's Public Access Counselor (July 28, 2026) and after this Court had taken up preservation at the August 10 hearing.

113. The false statement. On August 11, 2026, at approximately 1:12 p.m., Shea Russell of OCPD Records — responding to a separate open-records request (OCPD-11689-2026) submitted by Elizabeth Murray, a Florida attorney with no connection to Plaintiff or to this litigation — wrote that an address search for the June 6 incident had found no record, and asked whether the requester had "any names involved or an OCPD case number." Ms. Murray supplied the responding officer's name, the supervisor's name, and the time window. At 2:44 p.m. the same day, Mr. Russell wrote: "Thank you for the information. I was able to locate the incident." The Oklahoma City Police Department had located the record of the June 6 encounter on August 11, 2026.

114. Two days later, on August 13, 2026, at 10:00 a.m., the City — through OCPD Records, transmitting what the message itself describes as the findings of the Municipal Counselor's office — answered Plaintiff's own request, seven separate times in a single document, with the identical sentence: "Per Records No Subject record exists relating to that address regarding a June 6, 2026 contact with OCPD. As no record exists for that address a 51 O.S. § 24A.8(A) analysis is not necessary." That statement was false when made, and the City knew it was false when it made it: the same department's records unit had located the incident two days earlier, in a request processed by the same Municipal Counselor's office, after being given the same officer name and time window Plaintiff's own request supplied. The false statement was not an isolated slip — it was repeated seven times, used each time as the stated reason to skip the mandatory disclosure analysis of 51 O.S. § 24A.8(A), and it has never been withdrawn, corrected, or explained, despite Plaintiff's written demands of August 14 and August 17, 2026 that the City do so.

115. On August 17, 2026, the same office answered Ms. Murray's request by identifying the record by number — CAD-R 202606-0013672 — conceding that body-worn camera footage and a call log of the June 6 encounter exist, and denying release on entirely new grounds: that the footage "does not involve any of the requirements of release under 51 O.S. §24A.8(A)10.a," without identifying which of that provision's ten divisions were considered or what the footage supposedly lacks. Section 24A.8(A) commands that

law enforcement agencies "shall make available" the enumerated records, and its subparagraph (A)(10)(a) reaches recordings depicting the use of any physical force, "detentions of any length for the purpose of investigation," and "any exercise of authority by a law enforcement officer that deprives a citizen of his or her liberty" — each of which the June 6 recording necessarily depicts, because the encounter it recorded was a physical detention and search. The City's shifting sequence — nonexistence to Plaintiff on August 13; existence, a record number, and a content-based denial to a stranger on August 17 — is not administration of the Act. It is obstruction of it, directed at the one requester the record is about.

116. The same office simultaneously demanded that Ms. Murray execute an "Affidavit of Representation" as a condition of release — a condition imposed only after the record was located, with no basis anywhere in the Act, which opens public records "to any person," 51 O.S. § 24A.5 — and, when Ms. Murray asked in writing what rule required it, never answered. It told her that 911 audio is "only subject to release via subpoena or court order," although the Act contains no subpoena mechanism and the only override it supplies is a judicial finding under § 24A.8(B)(1). And it announced that the CAD record and call log would be produced only with "officer notes" and the caller's name redacted — though the mandatory categories of § 24A.8(A)(3) include "a brief summary of what occurred," and the caller whose name the City proposes to withhold is Plaintiff himself.

117. The reclassification. By letter dated August 14, 2026, Assistant Municipal Counselor Katie Goff refused to process paragraphs 17 through 38 of the June 11 request — the utility billing and inspection records for Plaintiff's own address, the SCADA and surge data, the contracts, bid files, ratification records, conflict-of-interest disclosures, board minutes, and financial reports — under the Open Records Act at all. The letter asserts that the Act "is not a vehicle for the discovery of information outside of the Oklahoma Discovery Code"; that because those paragraphs are "directly related to the allegations in your pending lawsuit," the City "will respond to these paragraphs, but they will be treated as Requests for Production in the above lawsuit"; and that as Requests for Production no response is due until after the City answers the Petition — an event the City alone controls, and which its own motions practice has deferred indefinitely. The letter identifies no exemption, no privilege, and no confidential record. It does not mention 51 O.S. § 24A.20, which commands that access to otherwise-public records "shall not be denied because a public body or public official is using or has taken possession of such records for investigatory purposes or has placed the records in a litigation or investigation file." And the discovery statute the letter quotes was quoted with its dispositive sentence omitted: the letter reproduces 12 O.S. § 3234(B)(2)(a) down through the sentence deferring the response

period until an answer is filed, and stops one sentence short of the provision's very next words, which authorize a response "prior to the filing of an answer" upon leave of court or the parties' written agreement.

118. Every record in paragraphs 17 through 38 was a public record on June 10, 2026, the day before Plaintiff asked; the City has never contended otherwise. The only fact the City identifies as having changed their character is that Plaintiff filed this lawsuit — which is precisely the circumstance § 24A.20 forbids treating as a ground of denial. The City's position, stated plainly, is that a citizen who sues Oklahoma City loses the statutory right of access that belongs to "any person," for the duration of the suit, on the City's own schedule. That position has no support in the Act, and the City has cited none.

119. The obstruction has a before-and-after that reveals its purpose. Before this suit was filed, the City completed a records request from Plaintiff in three days (November 23–26, 2024). After this suit was filed, Plaintiff's requests have produced four months of silence, a portal runaround, sixty days of non-acknowledgment, a seven-times-repeated false statement of nonexistence, and a formal position that the Act no longer applies to him. The variable is not the records; it is the litigation.

120. The obstruction also has a spoliation dimension. The August 13–14, 2026 order in this case recites counsel's representation that the City Clerk "has received and directed City records custodians to preserve the documents requested in Plaintiff's June 11, 2026 'Open Records Act Request and Preservation Demand.'" For the same four days that representation was being made, the Municipal Counselor's office was telling the requester that the central record — the June 6 body-camera footage — did not exist. A custodian who asserts in writing that no record exists has no evident occasion to preserve it, while retention periods run. The City has been on written notice since June 11, 2026 that loss, overwriting, or expiration of any of this material will be spoliation, and the record it denied and then identified — CAD-R 202606-0013672 and its associated media — is now fixed by number in the City's own correspondence.

121. Finally, the City's own intake system corroborated, within the same week, how thin the "address search" answer always was: on August 17, 2026, when Plaintiff submitted one dog complaint about the neighboring property, the City's own Action Center logged it twice, under two case numbers, keyed to two different addresses — 605 SE 21st Street (C26-52321) and 603 SE 21st Street (C26-52322). The City's systems key records to varying addresses for a single event; an address-only search for one address was never a basis for declaring that no record of the June 6 encounter existed — and by August 13 the

City was not relying on a search at all, because its own records unit had already located the incident.

**Part Eight — The Two-Tier Courthouse**

122. Oklahoma is a notice pleading state. Since the adoption of the Oklahoma Pleading Code in 1984, 12 O.S. § 2008 has required of a plaintiff only "a short and plain statement of the claim showing that the pleader is entitled to relief." The Legislature wrote that standard for every Oklahoman — including the ones who cannot afford counsel.

123. On April 21, 2026 — while the Defendants' motions to dismiss were pending in this case — Melissa Brake, represented by counsel, filed a wrongful-death petition in this same courthouse against Defendant Matthews Trenching Co., Inc. and one of its drivers. Brake v. Matthews Trenching Co., Inc., No. CJ-2026-3013 (Dist. Ct. Okla. Cnty.). Her petition is six numbered paragraphs long. Its entire factual account of the events sued upon is one sentence: "On and before April 8, 2026, Defendants' negligent acts and omissions caused a catastrophic collision that resulted in the wrongful death of Vernon Blake, a dedicated and beloved Oklahoma State Trooper." The petition does not say what the defendants did, when, where, how, or through whom; it does not distinguish between the two defendants; and it prays for actual and punitive damages exceeding the assets of the defendants.

124. That petition was met, appropriately, with the treatment Oklahoma law provides. No motion to dismiss for want of "defendant-specific facts" was filed against it. And the next morning, April 22, 2026, her counsel filed an emergency motion for a temporary restraining order and preservation order at 9:42 a.m.; the signed order granting it, ex parte, was file-stamped at 9:47 a.m. — five minutes later. The registered service agent for Matthews Trenching who received notice of that emergency relief is the same attorney, Maurice Woods II, who represents Matthews Trenching in this case.

125. Plaintiff pleaded more about Matthews Trenching in his original and First Amended Complaints — its role, its contract type, its high-volume emergency work, and the incentive structure it operates within — than the single sentence quoted above. For that, and for the rest of a pleading substantially more detailed than Brake's, Plaintiff received fourteen motions to dismiss, briefed on the federal "plausibility" standard of the federal courts — a pleading standard the Oklahoma Supreme Court has never adopted — including a motion that inserted the word "plausible" into its quotation of an Oklahoma Supreme Court group-pleading decision that actually says "reasonably inferred," and that reversed the dismissal it was cited to support. Plaintiff's motions for preservation of the body-camera evidence, filed August 3 and August 5, 2026, did not produce a five-minute ex parte order;

they were pending, unruled, when the footage's custodian was telling Plaintiff the footage did not exist.

126. The treatment extended past the docket and into chambers. By early August 2026, five of Plaintiff's motions sat filed and unruled: a motion for extension of time (May 1); a motion for extension of time to effect service (July 16); motions to hold the dismissal motions in abeyance pending the City's production of the withheld records, or to continue and for leave to respond out of time (July 13 and 16); motions to continue the dismissal hearings or for a special setting (August 3 and 5); and an emergency motion to preserve the June 6 body-worn camera footage (August 3 and 5). Under this county's motion-setting practice the burden of obtaining a hearing date falls entirely on the movant, and nothing ever sweeps an unset motion in front of the judge; the paper route had produced nothing. So before the August 10 hearing, Plaintiff went to Judge Andrews' chambers in person to press the continuance and abeyance requests, and spoke with the judge himself. In that conversation, the judge specifically implied that a request for a continuance was ordinary — the type of thing he would normally grant freely, early in litigation — and that this case was clearly early in litigation; and he said he did not want to grant it, or go into the specific request, because it would not be fair to do so without counsel present. The court thus acknowledged that the request was of a kind ordinarily granted, acknowledged the case was at the stage where such requests are ordinarily granted, and identified the absence of opposing counsel as the sole impediment — a condition that would be satisfied at the very next event in the case.

127. On Monday, August 10, 2026, that condition was met: counsel for the City and OCWUT were present. Plaintiff requested his continuance, exactly as he had told the court he would. The court did not address it. The continuance was not taken up; the abeyance was not taken up; none of the five pending motions received a ruling. Nor was the law: at no point in the hearing did the court discuss the legal arguments of any motion, analyze any element of any claim, or state legal reasoning as the basis for anything it did — the only law named was the bare citation of Section 2012(B)(6) as the ground of dismissal. When the City's denial of Plaintiff's records requests came up, Plaintiff attempted to raise that a pending lawsuit does not relieve the City of its Open Records Act obligations; the court did not take the point up with him, and instead directed that preservation of records be included in the journal entry — leaving the emergency preservation motion without a written ruling and the records unproduced. With full knowledge that Plaintiff had no oppositions on the record — because the motions requesting the time and the records needed to prepare them had never been ruled upon, and because the party withholding those records was the movant City itself — the court, without legal discussion, granted the

motions to dismiss of the five individual Defendants: Browning, Freeman, Holt, Couch, and Stonecipher. The court's own August 10 minute recites the dismissal of additional Defendants as well — Matthews Trenching, Krapff-Reynolds, and Black & Veatch — and the August 13 minute records that Archer Western's motion was "sustained on 8-10-26 in court": three days before the August 13 hearing for which that motion was noticed and calendared, and before Plaintiff's twelve responses, timely filed August 13 for that setting, were on the record. The written order filed that afternoon memorialized none of the oral rulings — no grounds, no with-or-without-prejudice designation, no leave to amend, no deadline — and was silent on every pending motion. Plaintiff wrote beside his signature: "(I only Read This)."

128. The surrounding docket carries its own record of unequal speed, in the clerk's own words. The order granting Plaintiff leave to file his First Amended Complaint was docketed March 25, 2026 as "SIGNED, IN OUTBOX" — and on June 3, 2026 the docket recorded it "LEFT IN OUTBOX OVER 60 DAYS": seventy days from signature to effect, for the order Plaintiff needed to proceed at all. The order memorializing the August 10 rulings was then entered on the defense's own draft, filed August 14 over Plaintiff's written objection — carrying defense counsel's handwritten annotation "WOULD NOT AGREE TO ORDER" — the day after it was signed. Seventy days for the plaintiff's order; one day for the defendants'.

129. The presiding judge belongs to the same civic stratum this Complaint describes. Judge Andrews holds his law degree from Oklahoma City University — the law school of which Defendant Holt has served as Dean since July 2023. His civic life runs through the same downtown institutions as the parties': a decade of officership in the downtown Kiwanis organization, the past presidency of the Downtown Exchange Club, and eight consecutive reported years (FY2017–FY2024) on the board of Cleats for Kids — the equipment charity that operates on the athletic fields Defendant Cimarron builds at cost for Fields & Futures, the charity of the McLaughlin family, whose family foundation's Secretary joined that same Cleats for Kids board in 2023, and whose founders are published endorsers of Defendant Holt. And the chairperson of Judge Andrews' active 2026 re-election committee — registered December 23, 2025, four weeks before this case was filed and assigned to him — is Michael L. Lauderdale, the managing director of McAfee & Taft, the firm that appears in this case as counsel of record for Defendant Archer Western and that entered an appearance for Defendant Noble on August 7, 2026, three days before the hearing. Mr. Lauderdale is not only the committee's chairman but its donor: the Ethics Commission's own records show his personal contributions to Judge Andrews' committees in all three election cycles — $2,700 (2017), $1,500 (2021), and $1,000 on December 17,

2025, six days before the 2026 committee registered with him as its chairperson. McAfee & Taft's own political action committee likewise contributed to all three of Judge Andrews' committees, including $2,000 on October 30, 2025 — money the committee held through the first six months of this case, while the firm's clients were before the court, until a partial refund issued on July 21, 2026, three weeks before the August 10 hearing. And the name partner of a second counsel-of-record firm in this case — Robert Magrini of Hayes Magrini & Gatewood, counsel for Defendant Crossland — appears in the same records as a contributor to Judge Andrews' 2018 committee.

130. The presiding judge is part of the same civic upper class whose members this action names, and the August 10 hearing operated to protect them: a continuance the court itself had described as ordinary was passed over in silence; five pending motions were bypassed; and the individual decision-makers of the network — the five people whose personal good faith is, under 51 O.S. § 152(13), the central disputed fact of this case — were dismissed on the merits, with no oppositions on the record, on motions whose factual premise the withheld records would have tested. Dismissing them at the pleading stage did not apply an immunity; it presumed the answer to the question this lawsuit exists to try, insulated the people Plaintiff seeks to hold accountable, and passed their exposure through to the City — that is, to the taxpayers, Plaintiff included, who funded the conduct in the first place. Plaintiff alleges that this was not neutral case management; it was the same machinery pleaded throughout this Complaint, operating in its own house, to cover for the enterprise described in it. Plaintiff brings this action as a member of Oklahoma City's lower class, entitled — like Melissa Brake, and like every Oklahoman — to notice pleading, to prompt records, to responsive city services, to police who protect complainants rather than frisk them, and to a court that rules on his motions before it rules on him.

**Part Nine — Governmental Tort Claims Act Compliance**

131. As to the water-system claims: Plaintiff presented a written notice of tort claim to the City Clerk of Oklahoma City dated September 12, 2025, and file-stamped by the City Clerk on September 24, 2025, itemizing the date, time, place, and circumstances of the loss, the identity of the entity, Plaintiff's identity and contact information, and compensation demanded of $42,500, in compliance with 51 O.S. § 156(E). That notice is in the record of this case: the City's co-defendant OCWUT attached it as Exhibit 1 to its own motion to dismiss. The claim was not approved within ninety days and was therefore deemed denied in late December 2025, 51 O.S. § 157(A), and Plaintiff commenced this action on January 21, 2026, within one hundred eighty days thereafter, 51 O.S. § 157(B).

132. The notice substantially complied as to OCWUT as well as the City. It was presented to the clerk of the City — OCWUT's sole beneficiary — and directed to "the City of Oklahoma City, d/b/a OKC Utilities Department," which is the operation OCWUT runs; the same Office of the Municipal Counselor represents, and represented, both entities; OCWUT's trustees are the City's own Mayor, Council members, and Manager (or their surrogates); the claim's subject — the water system serving Plaintiff's address — is administered by the same Utilities Department under the same General Manager; and neither entity has ever identified any prejudice, any investigation it could not conduct, or any information the notice failed to convey. OCWUT received everything § 156 exists to provide.

133. The June 6, 2026 police conduct is part of the same continuous course of conduct by the same political subdivision against the same claimant that was presented in Plaintiff's notice, deemed denied, and placed in suit in this action. Plaintiff additionally presented written notice of the June 6 conduct to the City Clerk on June 11, 2026, and served his records and preservation demand on the City the same day.

## CAUSES OF ACTION

### Count I — Negligence (Against All Defendants)

134. Plaintiff realleges and incorporates all preceding paragraphs.

135. The City and OCWUT owed Plaintiff, their ratepayer and customer, a duty to provide safe and accurate water utility service: to connect his home to a sound service line, to meter and bill him accurately, to inspect competently upon notice of anomalies, to respond promptly to reported defects, and to operate and maintain the distribution system — including mitigation of known hydraulic transient risks — with reasonable care. They breached each of those duties as pleaded in Parts One and Two: the wrong, defective hookup; the misrepresented billing; the questionnaire-and-self-help deflection of every notice; the cursory inspection and the false no-problem-on-the-city's-end door notice; the year of delay; and the operation of a system whose known surge vulnerabilities went unmitigated while its break rate nearly doubled.

136. The Individual City Defendants each owed and breached duties within their documented roles: Browning, with direct operational responsibility for the system, its emergency declarations, and its repair procurement, operated and staffed the system in the manner pleaded in Parts Two and Three despite a decade of surge and corrosion knowledge; Couch, the licensed Professional Engineer who architected the utility strategy and chairs the Trust, maintained and ratified that strategy with full technical knowledge of

its risks; Holt and Stonecipher, as trustee and voting surrogate trustee, ratified the emergency procurement channel and the operational status quo, month after month, while accepting the campaign funding pleaded in Part Four from the association of the firms they were ratifying awards to; and Freeman, as City Manager, construction purchasing agent, and promulgator of the consultant-selection guidelines, administered the procurement structure pleaded in Part Three. Each acted with willful and wanton disregard of known risks, outside the good faith that defines the scope of employment under 51 O.S. § 152(13), and each is accordingly liable in his individual capacity.

137. The Contractor Defendants and Engineer Defendants, in performing their water-system contracts, owed a duty of care not only to their contracting counterparties but to the foreseeably affected public those contracts served — the ratepayers and residents connected to the system, including Plaintiff. Each breached that duty in its own documented role: Crossland, whose Hefner ozone construction (WT-0151) coincided with and contributed to the transient conditions pleaded in Part Two; Archer Western, whose surge-tower and clearwell work left safety systems offline during transient events; Carollo, which designed, construction-managed, and inspected the same project in a self-certifying loop, with decades of surge knowledge unapplied; Black & Veatch, which supplied a decade of corrosion and degradation data documenting pipes that could not withstand transients, without effective mitigation; and Cimarron, Matthews Trenching, Krapff-Reynolds, and the other emergency-pool participants, which performed repair work on the failing system under the no-notice, capacity-driven emergency channel pleaded in Part Three, perpetuating an unrepaired, failure-generating distribution system from which they profited.

138. These breaches proximately caused Plaintiff's injuries: overbilling exceeding $2,500; property damage including crawlspace flooding, mold infestation, and remediation costs of $10,000 or more; property devaluation; and personal injuries including sinus and ear pain and ongoing effects of mold exposure.

**Count II — Nuisance and Inverse Condemnation (Against the City, OCWUT, Browning, Couch, Holt, Stonecipher, and Freeman)**

139. Plaintiff realleges and incorporates all preceding paragraphs.

140. Defendants' operation of the water system created and maintained a continuing nuisance at Plaintiff's property: a defective, flooded, over-pressurized connection that burst underground, flooded his crawlspace, and grew mold under his home, substantially and unreasonably interfering with the use and enjoyment of his property.

141. The same conduct effected a taking and damaging of Plaintiff's private property for public use without just compensation, in violation of Article II, § 24 of the Oklahoma Constitution: the operation of the public water system in the manner pleaded — including the pressure conditions and the defective connection the City itself installed and maintained — physically invaded Plaintiff's property with water and destroyed portions of its value. This inverse-condemnation claim arises under the Constitution and is expressly excluded from the GTCA's definition of "tort," 51 O.S. § 152(18); it is subject to neither the Act's notice prerequisites nor its caps.

142. Plaintiff is entitled to abatement, to just compensation for the property taken and damaged, and to his damages for the nuisance, including diminution in value, remediation, loss of use, and annoyance and discomfort.

**Count III — Breach of Implied Contract (Against the City and OCWUT)**

143. Plaintiff realleges and incorporates all preceding paragraphs.

144. As a ratepayer, Plaintiff had an implied contract with the City and OCWUT for accurate measurement and billing of water actually used and for the provision of water service without harm to his property. Defendants breached that contract by billing Plaintiff for water lost through their own defective infrastructure, by misrepresenting the accuracy of the billing, and by failing to provide the contracted service. Plaintiff was damaged in the amount of his overpayments and consequential losses. This claim sounds in contract and is outside the GTCA's notice regime.

**Count IV — Fraud and Misrepresentation (Against the City, OCWUT, and Browning)**

145. Plaintiff realleges and incorporates all preceding paragraphs.

146. Defendants made false representations of material fact to Plaintiff, with particulars as follows: (a) the City's billing statements represented, month after month from August 2024 forward, matching "incoming" and "outgoing" water figures presented as actual measurements of Plaintiff's usage, when the figures did not reflect measured return flow and the "usage" billed was in material part water escaping through the City's own defective connection; (b) on November 21, 2024, the City's representative "Angela" represented that answering a property questionnaire was the path to verification, deflecting inspection; (c) on April 14, 2025, the City's representative "Gabrielle" represented that self-testing and hiring Plaintiff's own professional were the appropriate next steps; and (d) in mid-April 2025, the City's field visit concluded with a written door notice representing, in

substance, that there was no problem on the city's end, when a defective, flooded City connection was in fact present and was later confirmed by the City's own crew. Browning, as Utilities Director and General Manager with operational responsibility for billing representations and inspection practices, directed, ratified, and maintained these representation practices.

147. The representations were false, were made with knowledge of their falsity or with reckless disregard for their truth, and were intended to induce — and did induce — Plaintiff's reliance, deterring earlier discovery of the defect. Plaintiff reasonably relied, continuing to pay the inflated bills and forgoing earlier intervention, and was damaged thereby. Fraud is categorically outside the good-faith scope of employment, and Browning is liable individually.

**Count V — Unjust Enrichment (Against the Contractor Defendants)**

148. Plaintiff realleges and incorporates all preceding paragraphs.

149. The Contractor Defendants received and retained benefits — the awards, emergency purchase orders, unit-price draws, and pricing-agreement payments itemized in Parts Three and Four and in the Parties allegations — paid from the ratepayer-funded revenues of the utility enterprise into which Plaintiff's own inflated payments were made. The enrichment was unjust because it flowed through the channel pleaded in Part Three: a procurement structure that suppressed the public notice and open competition state law requires, allocated the work within a closed pool, and grew without re-bidding under the unit-price exemption — systemic failures the recipients participated in and profited from, at the expense of the ratepayers, including Plaintiff, who funded the repairs. Equity requires disgorgement or restitution of the benefits unjustly retained.

**Count VI — Professional Negligence (Against Carollo Engineers and Black & Veatch)**

150. Plaintiff realleges and incorporates all preceding paragraphs.

151. As licensed professional engineering firms rendering services on the City's water system, Carollo and Black & Veatch owed a professional standard of care extending to the foreseeably affected public served by that system. Carollo breached it by designing and administering surge-prone configurations, by serving simultaneously as designer, construction manager, and inspector on Project WT-0151 — certifying its own work, under a statute that makes its certification the precondition to payment — and by failing to apply its own decades of surge analysis to protect the distribution system during the retrofit

period. Black & Veatch breached it by supplying more than a decade of corrosion and degradation analysis documenting pipes unable to withstand transient pressures without securing or recommending effective mitigation. These breaches were a proximate cause of the system conditions that injured Plaintiff.

**Count VII — Violations of the Oklahoma Open Records Act (Against the City and OCWUT)**

152. Plaintiff realleges and incorporates all preceding paragraphs.

153. Defendants violated the ORA in at least the following particulars: (a) failing for four months to respond in any way to the September 2025 request, and thereafter to the January 2026 request, in violation of the prompt-access command of 51 O.S. § 24A.5; (b) failing for sixty days to acknowledge the June 11, 2026 request, a constructive denial; (c) denying Plaintiff's request for the June 6 records on August 13, 2026 by means of a statement — repeated seven times — that no record existed, which was false when made and known by the City to be false, its own records unit having located the record two days earlier; that knowing false denial was a willful violation of the Act, 51 O.S. § 24A.17(A); (d) refusing, in the August 17, 2026 disposition, to perform the mandatory disclosure analysis of 51 O.S. § 24A.8(A) for records squarely within its enumerated categories — the body-worn camera recording of a physical detention, the in-car recordings, the CAD summary — and withholding rather than redacting; (e) imposing extra-statutory conditions, including an "Affidavit of Representation" and a purported subpoena requirement found nowhere in the Act; and (f) refusing, by the August 14, 2026 letter, to process paragraphs 17 through 38 of the request under the Act at all on the ground that Plaintiff is in litigation with the City — a ground 51 O.S. § 24A.20 expressly forbids — while asserting no exemption for any record.

154. Plaintiff has given the City written notice of each violation and of the governing statutory text, by his letters and memoranda of August 14 and August 17, 2026, and has a request for review pending before the Attorney General's Public Access Counselor, filed July 28, 2026 and supplemented August 17, 2026. The City has maintained every position.

155. Plaintiff is entitled to declaratory relief that the June 11, 2026 request is and remains a request under the Act; to an order directing production of the withheld records, including the body-worn camera and in-car recordings and unredacted CAD records for CAD-R 202606-0013672 (with only such redactions as § 24A.8(A)(10)(b) authorizes), upon the Court's finding under § 24A.8(B)(1) that the public interest and Plaintiff's interest outweigh any reason for denial; to production of the records sought in paragraphs 17

through 38 of the June 11, 2026 request; and to his reasonable costs and fees as the Act provides, 51 O.S. § 24A.17(B).

**Count VIII — Civil Conspiracy (Against the Individual City Defendants, the Contractor Defendants, and the Engineer Defendants)**

156. Plaintiff realleges and incorporates all preceding paragraphs.

157. Two or more of the Defendants combined to accomplish an unlawful object or a lawful object by unlawful means: the maintenance and exploitation of the procurement channel pleaded in Part Three — the suppression of statutorily required public notice; the confinement of "competitive" bidding to a closed, association-organized pool; the award of work above the statutory delegation cap before any authorizing vote; the routing of failure-driven repair volume into unit-price instruments exempt from re-bidding; and the perpetuation of the failing-system conditions that generate the work — at the expense of the ratepayers who fund it.

158. The combination, its object, and its overt acts are pleaded from the participants' own documents: the closed solicitation of "prospective bidders" on lists controlled in part by the declaring official; the seven "deemed beneficial to award the emergency directly to" incumbent awards; the ninety-four ratifications on four affirmative trustee votes; the association's PAC payments to the ratifying trustees, funded by the awardees' principals; and the individual awards, purchase orders, and pricing agreements itemized above. The underlying unlawful acts include the statutory violations pleaded in Part Three, the fraud pleaded in Count IV, and the torts pleaded in Counts I and VI. Plaintiff was damaged as pleaded. Each conspirator is jointly and severally liable for the resulting harm.

**Count IX — 42 U.S.C. § 1983: Unreasonable Seizure, Fourth and Fourteenth Amendments (Against the Officer Defendants and the City)**

159. Plaintiff realleges and incorporates all preceding paragraphs.

160. Acting under color of state law, the Officer Defendants seized Plaintiff on June 6, 2026 — ordering him against his own vehicle and physically restraining his hands behind his back — without a warrant, without probable cause, and without reasonable, articulable suspicion that Plaintiff had committed, was committing, or was about to commit any offense. Plaintiff was the complainant, on his own property, identified as such, suspected of nothing. The seizure violated Plaintiff's clearly established rights under the Fourth and Fourteenth Amendments to the United States Constitution.

161. The City is liable for the violation because it resulted from the City's own customs and practices, pleaded in Parts Five and Six and paragraph 168 below.

**Count X — 42 U.S.C. § 1983: Unreasonable Search (Against the Officer Defendants and the City)**

162. Plaintiff realleges and incorporates all preceding paragraphs.

163. Acting under color of state law, the Officer Defendants searched Plaintiff's person without any lawful basis: a protective frisk requires reasonable suspicion, separate from any basis for a stop, that the subject is armed and presently dangerous, and none existed — Plaintiff was a compliant complainant in night clothes holding a vaporizer the officers recognized as such. The search moreover exceeded in scope and manner anything a weapons frisk permits: it included the deliberate contact with and manipulation of Plaintiff's genitals. The search violated Plaintiff's clearly established rights under the Fourth and Fourteenth Amendments, and the City is liable on the same municipal basis pleaded in paragraph 168.

**Count XI — 42 U.S.C. § 1983: Excessive Force (Against the Officer Defendants and the City)**

164. Plaintiff realleges and incorporates all preceding paragraphs.

165. The force applied to Plaintiff — seizing him, forcing him against his vehicle, restraining his hands, and the offensive bodily contact of the search — was objectively unreasonable in the totality of the circumstances, in which no crime was suspected, no threat existed, no resistance occurred, and no force at all was justified. The conduct violated Plaintiff's clearly established Fourth and Fourteenth Amendment rights, and the City is liable on the municipal basis pleaded in paragraph 168.

**Count XII — 42 U.S.C. § 1983: First Amendment Retaliation (Against the Officer Defendants and the City)**

166. Plaintiff realleges and incorporates all preceding paragraphs.

167. Plaintiff engaged in activity protected by the First Amendment: his complaints to his government about its services, his complaints against police non-enforcement, his public criticism of the Mayor, and his petitioning of the courts in this action. The June 6, 2026 detention and search was an adverse action that would chill a person of ordinary firmness from continuing that activity, and it was substantially motivated by the protected activity: it came three days after this Court accepted Plaintiff's amended complaint against the City; it was inflicted on the complainant in a call class in which complainants are not

detained or searched and in which, across approximately fifty of Plaintiff's own complaints, no such thing had ever occurred; it followed a documented chain of the City's institutional awareness of and hostility toward Plaintiff's complaints, including the blocking of Plaintiff on the Mayor's social-media account after his criticism; and Plaintiff was never arrested, cited, or charged, so no probable-cause bar applies. The conduct violated Plaintiff's clearly established First and Fourteenth Amendment rights.

168. Municipal liability. The City is liable under § 1983 for Counts IX through XII because the violations were caused by its own customs, practices, and deliberate indifference: (a) a documented, years-long custom — evidenced by the City's own intake and disposition records pleaded in Part Five — of servicing complaints on paper while withholding enforcement, of responding to Plaintiff's approximately fifty complaints with warnings, "extra patrols," on-scene excuses, a single never-prosecuted citation, and eleven "No incident report made" notations; (b) the practice, applied on June 6, of subjecting the complainant himself to detention and search while generating no incident report at all — conduct undocumented by design and therefore insulated from supervision, discipline, and review; (c) deliberate indifference in training and supervision concerning investigative detentions, frisks, and the treatment of complainants, of which the June 6 encounter — performed openly, on camera, with a supervisor engaged, and described on scene as standard policy — is direct evidence, an officer's invocation of standard policy being an admission that the conduct reflects the City's practice rather than an individual aberration; and (d) ratification: the City, with the encounter recorded on its own cameras and identified in its own systems, has not disciplined anyone, has not corrected anything, and has instead denied to the victim that any record of the event exists. The Officer Defendants are liable in their individual capacities; official-capacity designations are maintained for prospective injunctive relief.

**Count XIII — Assault, Battery, False Imprisonment, and Intentional Infliction of Emotional Distress (Against the Officer Defendants and the City)**

169. Plaintiff realleges and incorporates all preceding paragraphs.

170. The June 6, 2026 conduct constituted, under Oklahoma law: assault (the intentional creation of apprehension of harmful or offensive contact); battery (the intentional, unconsented, harmful and offensive contact with Plaintiff's person, including the offensive sexual contact of the manipulation of his genitals, which no weapons-search purpose can privilege); false imprisonment (the intentional, unlawful restraint of Plaintiff's liberty against his own vehicle, hands held behind his back, when a reasonable person would not have felt free to leave); and intentional infliction of emotional distress (extreme

and outrageous conduct — the public, groundless detention and sexually intrusive search of a complainant on his own property — undertaken intentionally or recklessly and causing severe distress).

171. To the extent the Officer Defendants acted within the scope of their employment, the City is liable for these torts as their employer under the GTCA, Plaintiff's compliance with which is pleaded in Part Nine. To the extent any officer's conduct — including the sexual contact — fell outside the good-faith scope of employment, that officer is liable individually and without the Act's protections, and no presentment prerequisite applies to him. Plaintiff pleads these theories in the alternative, as the facts developed in discovery will establish.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and severally as the law provides, for:

a. Compensatory damages, including overbilling exceeding $2,500; property damage, remediation, and devaluation of $10,000 or more; medical and health-related damages; damages for annoyance, discomfort, humiliation, and emotional distress; and all damages recoverable under 42 U.S.C. § 1983 — in a total amount to be proven at trial;

b. Just compensation under Article II, § 24 of the Oklahoma Constitution for the taking and damaging of Plaintiff's property;

c. Restitution and disgorgement of the Contractor Defendants' unjust enrichment;

d. Punitive damages against the Individual City Defendants, the Officer Defendants, the Contractor Defendants, and the Engineer Defendants only — Plaintiff expressly does not seek punitive or exemplary damages against the City or OCWUT, whose liabilities would fall on the ratepayers and taxpayers who already funded the conduct at issue;

e. Injunctive and declaratory relief: requiring inspection, repair, and surge mitigation of the water infrastructure serving Plaintiff's property; declaring the June 11, 2026 records request a request under the Open Records Act and compelling production as pleaded in Count VII, including the body-worn camera and associated records of CAD-R 202606-0013672 upon the Court's finding under 51 O.S. § 24A.8(B)(1); requiring preservation of all records identified in the June 11, 2026 demand; requiring the withdrawal or written explanation of the August 13, 2026

nonexistence statement; and requiring disclosure and expungement of any officer-safety flag, alert, or "BOLO" notation associated with Plaintiff, his telephone number, or his address;

f. Attorney fees and costs to the extent allowed by law, including under 51 O.S. § 24A.17(B) and 42 U.S.C. § 1988, and all recoverable costs of this action;

g. Pre- and post-judgment interest; and

h. Such other relief as the Court deems just.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted,

[signature]

Anthony Trupia, Plaintiff Pro Se
605 SE 21st Street
Oklahoma City, OK 73129
516-984-0142
Trupiaar@gmail.com
Dated: August 31, 2026

CERTIFIED COPY
AS FILED OF RECORD
IN DISTRICT COURT
SEP 08 2026
RICK WARREN COURT CLERK Oklahoma County

**CERTIFICATE OF SERVICE**

I certify that on this 31st day of August, 2026, a true and correct copy of the foregoing Second Amended Complaint was served by electronic mail and/or U.S. Mail, postage prepaid, upon all counsel of record: Sherri R. Katz and Katie Goff (City of Oklahoma City, OCWUT, Chris Browning, David Holt, James D. Couch, Mark Stonecipher, and Craig Freeman); Christopher T. Combs, Cole B. Brown, and Ethan Elrod (Crossland Heavy Contractors, Inc.); Maurice G. Woods, II, Don W. Danz, and Deborah Russell (Matthews Trenching Co., Inc.); Christian S. Huckaby and Jennifer B. Puckett (Archer Western Construction, LLC); Eric L. Combs and Matthew J. Becker (Wynn Construction Co., Inc. and Rick Thompson); Jennifer M. King (Krapff-Reynolds Construction Company); Kiran A. Phansalkar, Preston M. Sullivan, and Elizabeth H. Attaway (Black & Veatch Corporation); and by U.S. Mail upon the unrepresented Defendants at their addresses of record.

[signature]

Anthony Trupia